[No. S025807. June 1, 1993.]

CYNTHIA D., Petitioner, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY, Respondent;
SAN DIEGO COUNTY DEPARTMENT OF SOCIAL SERVICES, Real
Party in Interest.

**COUNSEL**

Glenn J. Cox for Petitioner.

Thor O. Emblem and Tracy L. Emblem as Amici Curiae on behalf of Petitioner.

Llloyd M. Harmon, County Counsel, Susan Strom, Chief Deputy County Counsel, and Gary C. Seiser, Deputy County Counsel, for Respondent.

No appearance for Real Party in Interest.

Gary Plavnick for Minor.

## Opinion

PANELLI, J.—This is one of several cases we have taken to resolve recurring issues involving juvenile dependency proceedings pursuant to Welfare and Institutions Code section 300 et seq.[1] The sole issue raised in the petition for review in this case is a due process challenge to the statutory provisions that allow termination of parental rights based on a lesser standard of proof than clear and convincing evidence. The Court of Appeal found the provisions to be constitutional. We affirm.

### Facts

Only a skeletal statement of facts is necessary since the question presented is legal rather than factual in nature. A dependency petition was filed in April 1989 on behalf of Sarah D. (minor) by the San Diego County Department of Social Services (DSS) alleging that Cynthia D. (mother) was unable to protect minor from molestation and nonaccidental injury and that mother used narcotics and/or dangerous drugs. (§ 300, subd. (b).) Juvenile court jurisdiction was found, and minor was declared a dependent of the juvenile court in June 1989. Minor was initially placed in the home of a relative, but a supplemental petition was filed when the relative became unable to care for minor. The court found the allegation in the supplemental petition true by clear and convincing evidence, and minor was placed with a foster family, with whom she still resides. The foster parents have been approved to adopt minor in the event she becomes eligible for adoption.

Following several review hearings, an 18-month review hearing was held on May 29, 1991. At that time, based on a preponderance of the evidence, the court found that return of minor to mother's custody would create a substantial risk of detriment to minor, that reasonable reunification services had been provided mother, and that the matter should be set for a selection and implementation hearing under section 366.26 to determine whether the permanent plan for minor should be long-term foster care, guardianship, or adoption.

A few days before the date set for the section 366.26 hearing, mother filed a petition for writ of mandate/prohibition seeking to have the Court of

---

[1]Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.

Appeal order the trial court to vacate its order setting the section 366.26 hearing and to prohibit it from taking any further action to terminate mother's parental rights. Mother claimed that the statutory provisions violated due process because they allowed findings of detriment to be made by a preponderance of the evidence rather than by clear and convincing evidence. The Court of Appeal denied relief, and we granted review.

STATUTORY HISTORY AND FRAMEWORK

1. *Historical Review.*

A review of the history and purpose of the legislation is helpful in understanding the issue presented. In 1979, following several years of hearings and studies, the United States Congress proposed a major revision of the funding of child welfare services. (See 1980 U.S. Code Cong. & Admin. News, at p. 1448.) The legislation was ultimately enacted as the Adoption Assistance and Child Welfare Act of 1980, Public Law No. 96-272. (See 42 U.S.C. § 670 et seq.) It was designed to "lessen the emphasis on foster care placement and to encourage greater efforts to find permanent homes for children either by making it possible for them to return to their families or by placing them in adoptive homes." (1980 U.S. Code Cong. & Admin. News, at p. 1450.) Public Law No. 96-272 required states, as a condition of federal funding, to enact legislation that mandated active efforts to keep children in their homes if possible, to reunify families if removal proved necessary, and to select permanent plans, including adoption, in a timely fashion if the families could not be reunified. (See 42 U.S.C. §§ 671 (a)(14), 672, 675.)

In 1982, the Legislature passed Senate Bill No. 14 to bring California into compliance with Public Law No. 96-272. (Stats. 1982, ch. 978, p. 3525.) It established a more structured framework for the protection of abused, neglected and abandoned children as dependents of the juvenile court and for services to their families. Among other things, the legislation established a clear and convincing standard for removal of children from their parents (§ 361), reviews every six months (§§ 364, 366), reunification services (former § 361, subd. (e); now § 361.5), and permanency planning hearings for children who could not be returned to a parent within 12 to 18 months (§ 366.25). At the permanency planning hearing the juvenile court could select one of three possible permanent plans: adoption, guardianship, or long-term foster care. If adoption were selected, a separate proceeding in the superior court had to be filed pursuant to Civil Code section 232 to implement the plan.

These revisions still fell short of the desired goal. As Justice Brauer observed in a concurring opinion in *In re Micah S.* (1988) 198 Cal.App.3d

557, 564 [243 Cal.Rptr. 756], there were still lengthy delays, especially when adoption was selected as the permanent plan. Months, or even years, might pass before the separate termination proceeding would be completed in superior court: "The passage of five or more years from initial removal of the child from its home to ultimate resolution and repose [was] by no means unusual." (*Id.* at p. 565 (conc. opn. of Brauer, J.).)

The Legislature, acknowledging the problem, established a task force to review and coordinate child abuse reporting statutes, child welfare services, and dependency court proceedings. (Stats. 1986, ch. 1122, p. 3972.) The task force was comprised of a broad-based group of experts appointed by the Senate Select Committee on Children and Youth. Based on the work and recommendations of the task force, the Legislature passed Senate Bill No. 243 in 1987 (Stats. 1987, ch. 1485, p. 5598) as a comprehensive revision of laws affecting children. (Sen. Select Com. on Children & Youth, SB 1195 Task Force Rep. on Child Abuse Reporting Laws, Juvenile Court Dependency Statutes, and Child Welfare Services (Jan. 1988), p. i [hereafter Task Force Report].)

Senate Bill No. 243 substantially changed the procedure for permanently severing parental rights in cases where the child is a dependent of the court. It eliminated the need to file a separate Civil Code section 232 proceeding and brought termination of parental rights for dependent children within the dependency process through a selection and implementation hearing pursuant to section 366.26. The task force reasoned that by eliminating the need for a separate action, "minors who are adoptable will no longer have to wait months and often years for the opportunity to be placed with an appropriate family on a permanent basis." (Task Force Report, *supra*, p. 10.)[2]

2. *Current System.*

The juvenile dependency system, as modified by Senate Bill No. 243, begins with section 300, which lists specific situations that will bring a child within the jurisdiction of the juvenile court for dependency proceedings. The former broad language of section 300 was made much more specific in an attempt to "ensure more uniform application of the law throughout the state and to ensure that court intervention does not occur in situations the Legislature would deem inappropriate." (Task Force Report, *supra*, p. 3.)

A peace officer, probation officer, or social worker, who has reason to believe that a child falls within the definitions set forth in section 300 and is

---

[2]Although the Task Force Report was published in January 1988, after the enactment of Senate Bill No. 243, the report states that it "documents the intent of the new laws." (*Id.*, p. i.)

in immediate danger as a result thereof, may remove the child from the home. (§§ 305, 306.)[3] A petition to have such a child declared a dependent child must be filed within 48 hours excluding nonjudicial days. (§ 313; Cal. Rules of Court, rule 1440(a).) A "detention hearing" must be held by the juvenile court no later than the next judicial day. (§ 315; Cal. Rules of Court, rule 1440(d).) The parents are entitled to court-appointed counsel to represent them throughout the proceedings if they cannot afford counsel. (§ 317.)[4] At the detention hearing the department of social services bears the burden of making a prima facie showing that the minor comes within section 300 and that there is a need for detention under specified conditions. (§ 319.) The court must make findings regarding whether reasonable efforts were made "to prevent or eliminate the need for removal of the minor from his or her home" and, if the minor is to be detained, must order services "to be provided as soon as possible to reunify the minor and his or her family if appropriate." (§ 319.)

The court must set a hearing on the dependency petition within 15 days of the detention order when the minor is detained. (§ 334; Cal. Rules of Court, rule 1447(b).) This is commonly referred to as a jurisdictional hearing since it is at this hearing that the court determines whether the allegations in the petition that the minor comes within section 300, and thus within the juvenile court's jurisdiction, are true. (§ 355.) Jurisdictional findings must be made by at least a preponderance of the evidence. (§ 355; Cal. Rules of Court, rule 1450(f).)

When the court has found jurisdiction under section 300, it then must conduct a disposition hearing. (§ 358; Cal. Rules of Court, rules 1451, 1455.) If the court declares the child to be a dependent child of the juvenile court, it then considers whether the child may remain with the parents or whether the child must be removed from the parents pursuant to section 361, subdivision (b). At the dispositional hearing, the standard of proof for removal from a custodial parent is clear and convincing evidence. (§ 361, subd. (b); Cal. Rules of Court, rule 1456(c).)

If the child is removed from the parents' custody, the court must make orders regarding reunification services. (§ 361.5.) The court must also notify the parents that their parental rights may be terminated if they do not reunify

---

[3]Our review of the dependency process is limited to those cases in which the child is removed from the home since they are the only ones that carry the potential for termination of parental rights.

[4]Appointment of counsel previously had been a matter of juvenile court discretion. Senate Bill No. 243 made appointed counsel mandatory when out-of-home placement is involved. (§ 317, subd. (b).)

within 12 months. (*Ibid.*; Cal. Rules of Court, rule 1456(f).)[5] The parents have the right to challenge both the jurisdictional and dispositional findings and orders on appeal. (§ 395.)

Thereafter the juvenile court must review the case at least once every six months. (§ 366.) At these review hearings there is a statutory presumption that the child will be returned to parental custody unless the court finds by a preponderance of the evidence that "the return of the child would create a substantial risk of detriment to the physical or emotional well-being of the minor."[6] The department of social services, not the parent, bears the burden of establishing that detriment. (§§ 366.21, subds. (e), (f), 366.22, subd. (a).) The court must also determine whether reasonable reunification services have been offered. (*Ibid.*)

At the 12-month review, if the court does not return the child and finds that there is no substantial probability of return to the parent within 18 months of the original removal order, the court must terminate reunification efforts and set the matter for a hearing pursuant to section 366.26 for the selection and implementation of a permanent plan. (§ 366.21, subd. (g).) Even then, the court must determine by clear and convincing evidence that reasonable reunification services have been provided or offered to the parents. (§ 366.21, subd. (g)(1).) If the child is not returned to the parents at the 18-month review, the court must set the matter for a section 366.26 hearing.

The selection and implementation hearing pursuant to section 366.26 is to be heard within 120 days of the hearing from which it was set. (§§ 361.5, subd. (f), 366.21, subds. (e), (g), 366.22, subd. (a).) The court may terminate parental rights "only if it determines by clear and convincing evidence that it is likely that the minor will be adopted." (§ 366.26, subd. (c)(1).) If the court so determines, the findings, "pursuant to Section 366.21 or Section 366.22 that a minor cannot or should not be returned to his or her parent or guardian, shall then constitute a sufficient basis for termination of parental rights unless the court finds that termination would be detrimental to the minor" due to any of certain specified circumstances. (§ 366.26, subd. (c).)

Thus, in order to terminate parental rights, the court need only make two findings: (1) that there is clear and convincing evidence that the minor will

[5]Thus, to state, as does the dissent, that Sarah was "temporarily" removed from her mother's custody, may be misleading.

[6]The language differs slightly in section 366.21, subdivision (f). It reads "substantial risk *or* detriment" instead of "substantial risk *of* detriment," as stated in section 366.21, subdivision (e) and section 366.22, subdivision (a). The most logical explanation for the difference in language is that the word "or" is a typographical error; that "or" should have read "of."

be adopted; and (2) that there has been a previous determination that reunification services shall be terminated. According to the task force, "the critical decision regarding parental rights will be made at the dispositional or review hearing, that is, that the minor cannot be returned home and that reunification efforts should not be pursued. In such cases, the decision to terminate parental rights will be relatively automatic if the minor is going to be adopted." (Task Force Report, *supra*, p. 11.) The task force's intent was "to eliminate duplication between the regular review hearings and the termination hearing. Therefore, the decisions made at the review hearing regarding reunification are not subject to relitigation at the termination hearing. This hearing determines only the type of permanent home." (Task Force Report, *supra*, p. 12.)

## ARGUMENT

■ Mother contends that the previously described statutory framework violates due process because it allows a parent's rights to be terminated based on a finding by a preponderance of the evidence that return of the child to parental custody would create a substantial risk of detriment to the child. She maintains that due process requires that the finding be made by clear and convincing evidence and relies on *Santosky* v. *Kramer* (1982) 455 U.S. 745 [71 L.Ed.2d 599, 102 S.Ct. 1388] and *In re Angelia P.* (1981) 28 Cal.3d 908 [171 Cal.Rptr.2d 637, 632 P.2d 198] as support for that proposition.[7] Similar claims have been made by parents in other cases, with varying results. The Court of Appeal in *In re Heather B.* (1992) 9 Cal.App.4th 535 [11 Cal.Rptr. 891] aptly described *Santosky* as follows:

"In *Santosky* v. *Kramer, supra,* 455 U.S. 745, the United States Supreme Court considered New York's procedures for the termination of parental rights upon a determination that a child was 'permanently neglected.' Under New York law a child could be removed from parental custody upon a finding of neglect and the parental relationship could be severed upon a finding of permanent neglect. Permanent neglect would be shown by evidence that the child had been in state custody for a year or more, the state had made diligent efforts to encourage and strengthen the parental relationship, but the parents failed substantially and continuously or repeatedly to

---

[7]Requests for judicial notice have been filed by mother and amicus curiae on behalf of mother. (See Evid. Code, §§ 452, 459.) We grant mother's request for judicial notice of certain amended versions of Senate Bill No. 243, enacted as Statutes 1987, chapter 1485, and amicus curiae's request for judicial notice of the court record in *In re Sarah D.*, S026737, a companion case. We deny amicus curiae's request for judicial notice of the Little Hoover Commission Report, Mending our Broken Children: Restructuring Foster Care in California, and the 1991-92 San Diego Grand Jury Report, entitled, Families in Crisis, Report No. 2, because these reports are irrelevant to the question of the constitutionality of the statutory scheme. (Evid. Code, § 459, subd. (a).)

maintain contact with the child or to plan for his or her future although physically and financially able to do so." (*Id.* at p. 748 [71 L.Ed.2d at p. 603].) These findings were to be proven by a ' "fair preponderance of the evidence." ' (*Ibid.*)

"In *Santosky*, by a five-to-four decision, the high court found that the New York procedure did not comport with due process requirements. The court noted that the function of a standard of proof is to instruct the fact finder concerning the degree of confidence he or she should have in the correctness of factual conclusions for a particular type of adjudication. (455 U.S. at pp. 754-755 [71 L.Ed.2d at pp. 607-608].) This reflects the weight of the private and public interests affected as well as a societal judgment about how the risk of error should be distributed between the parties. (*Ibid.*) In a civil dispute over monetary damages the preponderance of the evidence standard reflects society's minimal concern with the outcome and a conclusion that the parties should bear the risk of error in roughly equal fashion. (*Ibid.*) Parental rights, on the other hand, are a fundamental liberty interest and the standard of proof required in an action to terminate such rights requires a balancing of the private interests affected, the risk of error created by the state's chosen procedure, and the countervailing governmental interest supporting the procedure. (*Id.* at pp. 753-754 [71 L.Ed.2d at pp. 606-607].)

"On the first factor, the private interests affected, the court noted that parental rights are fundamental and that the state sought not merely to infringe, but to end those interests. (*Santosky* v. *Kramer, supra,* 455 U.S. at pp. 758-759 [71 L.Ed.2d at p. 610].) The child and his or her foster parents are 'deeply interested' in the outcome, '[b]ut at the factfinding stage of the New York proceeding, the focus emphatically is not on them. [¶] The factfinding does not purport—and is not intended—to balance the child's interest in a normal family home against the parents' interest in raising the child. Nor does it purport to determine whether the natural parents or the foster parents would provide the better home. Rather, the factfinding hearing pits the State directly against the parents.' (*Id.* at p. 759 [71 L.Ed.2d at p. 610].) Until the state has established parental unfitness it cannot assume that the interests of the child and his or her parents diverge and until such time parent and child share an interest in preventing an erroneous termination of the relationship. (*Id.* at p. 760 [71 L.Ed.2d at p. 611].) The *Santosky* court concluded that the balance of private interests strongly favored heightened procedural protections. (*Ibid.*)

"Concerning the second factor, the risk of error in the chosen procedure, the court held that a New York permanent neglect proceeding is an adversary contest between the state and a child's natural parents, and that in such

circumstances the relevant question is whether a preponderance of the evidence standard fairly allocates the risk of an erroneous factfinding between these two parties. (*Santosky* v. *Kramer, supra,* 455 U.S. at p. 761 [71 L.Ed.2d at p. 612].) The court found that several aspects of the New York procedure combined to magnify the risk of an erroneous determination, including imprecise substantive standards which left determinations unusually open to subjective standards; the fact that the court possessed unusual discretion to underweigh probative evidence favoring the parent; the state's greater ability to assemble its case; the fact that the state had the power to shape the historical events that formed the basis for termination; and the lack of any 'double jeopardy' defense against repeated state termination efforts. (*Id.* at pp. 762-764 [71 L.Ed.2d at pp. 612-613].) The court concluded that increasing the burden of proof is one way to impress the fact finder with the importance of the decision and thereby reduce the chances of an erroneous determination. (*Ibid.*)

"With respect to this second factor the high court addressed the conclusion of the New York courts that the preponderance standard properly allocated the risk of error between the parents and the child. The court found this view to be fundamentally mistaken. (*Santosky* v. *Kramer, supra,* 455 U.S. at p. 765 [71 L.Ed.2d at p. 614].) That theory assumed that termination would invariably benefit the child, which the court found to be a hazardous assumption at best in view of the lack of assurance that termination would result in adoption and evidence that after termination many New York children entered the limbo of long-term foster placement. (*Id.* at p. 765, especially fn. 15 [71 L.Ed.2d at p. 614].) In any event, under New York's procedure the consequence of an erroneous determination for the child was the preservation of an 'uneasy status quo' and this risk did not weigh heavily against the parents' risk of erroneous termination of parental rights. (*Id.* at pp. 765-766 [71 L.Ed.2d at pp. 614-615].)

"On the third factor, the governmental interest supporting the procedure, the court identified the state's interests as the *parens patriae* interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings. (*Santosky* v. *Kramer, supra,* 455 U.S. at pp. 766-767 [71 L.Ed.2d at p. 615].) Where there is still reason to believe that a positive, nurturing parent-child relationship exists the *parens patriae* interest favors preservation rather than termination of parental bonds. Moreover, the court concluded, an elevated standard of proof would not unduly burden New York's fact finders. (*Ibid.*)" (*In re Heather B., supra,* 9 Cal.App.4th at pp. 550-552.)

Our decision in *In re Angelia P., supra,* 28 Cal.3d 908, preceded *Santosky* v. *Kramer. In re Angelia P.* dealt with a proceeding brought under Civil Code

section 232 to terminate parental rights for parental neglect. We rejected a claim that proof beyond a reasonable doubt rather than the legislatively prescribed clear and convincing evidence standard should be required for termination of parental rights under Civil Code section 232. We held that the clear and convincing evidence standard appropriately balanced the interests involved: "(1) the parent and child in a continuing familial relationship; (2) the parent in preserving the integrity and privacy of the family unit, free of state intervention and social stigma attached to either parent or child; (3) the child in a permanent, secure, stable, and loving environment; and (4) the state in protecting the child." (*In re Angelia P.*, *supra*, 28 Cal.3d at p. 919.)

 Turning to the current statutory scheme, section 366.26 cannot properly be understood except in the context of the entire dependency process of which it is part. Unlike the termination hearings evaluated in *Santosky* v. *Kramer*, *supra*, 455 U.S. 745, and *In re Angelia P.*, *supra*, 28 Cal.3d 908, the purpose of the section 366.26 hearing is not to accumulate further evidence of parental unfitness and danger to the child, but to begin the task of finding the child a permanent alternative family placement.[8] By the time dependency proceedings have reached the stage of a section 366.26 hearing, there have been multiple specific findings of parental unfitness. Except for a temporary period, the grounds for initial removal of the child from parental custody have been established under a clear and convincing standard (see § 361, subd. (b)); in addition, there have been a series of hearings involving ongoing reunification efforts and, at each hearing, there was a statutory presumption that the child should be returned to the custody of the parent. (§§ 366.21, subds. (e), (f), 366.22, subd. (a).) Only if, over this entire period of time, the state continually has established that a return of custody to the parent would be detrimental to the child is the section 366.26 stage even reached.

 We therefore conclude that the three factors relied upon in *Santosky* v. *Kramer*, *supra*, 455 U.S. 745, to require an elevated standard of proof do not compel the use of that standard in this case under our statutory scheme.

[8]As previously mentioned, the termination proceeding in *In re Angelia P.*, *supra*, 28 Cal.3d 908, was pursuant to Civil Code section 232. A Civil Code section 232 proceeding to terminate parental rights is heard in the superior court as a new action in which the superior court must find by clear and convincing evidence the existence of statutorily specified grounds of parental fault. (Civ. Code, § 232, subd. (c).) The higher standard of proof is appropriate in light of the fact that this is a separate proceeding in which specific findings of fault or detriment are required. The present statutory scheme, by contrast, requires the juvenile court to conduct multiple hearings and findings of detriment before the section 366.26 stage is reached. Thus the Civil Code section 232 proceeding is not comparable to a proceeding pursuant to section 366.26 in which parental rights are terminated. The Civil Code section 232 proceeding bears more similarity to the New York proceeding at issue in *Santosky* v. *Kramer*, *supra*, 455 U.S. 745, than it does to the statutory scheme being evaluated in the present case.

The first factor—the private interest affected—was said in *Santosky* v. *Kramer* to weigh heavily in favor of the natural parent at "the factfinding stage" of a state-initiated permanent neglect proceeding in which it is the burden of the state to show that "the natural parents are at fault." (*Santosky* v. *Kramer, supra*, 455 U.S. at p. 759 [71 L.Ed.2d at p. 610].) "[U]ntil the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." (*Id.* at p. 760 [71 L.Ed.2d at pp. 610-611].)

The present California scheme is significantly different.[9] It is not the purpose of the section 366.26 hearing to show parental inadequacy, which had to have been previously established, and there is no burden on the petitioning agency to show at the section 366.26 hearing that the parents are "at fault." The number of previous findings of "fault," coupled with the seriousness of the resulting danger to the minor, most clearly differentiate the section 366.26 hearing from the termination hearing in *Santosky* v. *Kramer*. A parent whose conduct has already and on numerous occasions been found to grievously endanger his or her child is no longer in the same position as a parent whose neglect or abuse has not so clearly been established. At this point the interests of the parent and child have diverged, and the child's interest must be given more weight. Because section 366.26 contemplates termination of parental rights only when there is clear and convincing evidence that the child is likely to be adopted, the child's fundamental interest in the opportunity to experience a stable parent-child relationship is very much at stake at the section 366.26 hearing. In this setting, a burden of proof standard that tilted the evidentiary scales in favor of the parent (as a clear and convincing evidence standard would do) would have the inevitable effect of placing a greater risk on the child than on the parent.

The second factor considered in *Santosky* v. *Kramer, supra*, 455 U.S. 745, was the risk of erroneous fact-finding. The New York scheme employed "imprecise substantive standards that leave determinations unusually open to the subjective values of the judge," thus allowing "unusual discretion to underweigh probative facts that might favor the parent." (*Id.* at p. 762 [71 L.Ed.2d at p. 612].) This risk is substantially diminished under our scheme, which emphasizes "preservation of the family whenever possible." (§ 300, subd. (j).) Nowhere in our scheme has the Legislature invited value judgments comparable to those described in *Santosky*. Indeed, our scheme requires: (1) a court finding that "there is a substantial risk of serious future

[9]This analysis is adapted from a concurring opinion by Kline, J., in the Court of Appeal in *In re Michaela C.* ▮(Cal.App.).

injury" to the minor in order to establish dependency (§ 300, subd. (a)); (2) a finding by clear and convincing evidence that there is "substantial danger to the physical health of the minor" in order to remove the child from parental custody (§ 361, subd. (b)(1)); and (3) repeated findings by a preponderance of the evidence that return "would create a substantial risk of detriment to the physical or emotional well-being of the minor" (§§ 366.21, subds. (e), (f), 366.22, subd. (a)).

One of the reasons the court in *Santosky v. Kramer* felt it necessary to elevate the government's burden of proof was the disparity between the litigation resources available to the parties. "The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense." (*Santosky v. Kramer, supra,* 455 U.S. at p. 763 [71 L.Ed.2d at pp. 612-613].) Among other things, the government's attorney "enjoys full access to all public records concerning the family" and, "because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination." (*Ibid.*) The California dependency statutes, by contrast, provide the parents a much more level playing field. Not only must the court appoint counsel for a parent unable to afford one whenever a petitioning agency recommends out-of-home care (§ 317, subd. (b)), but such counsel must continue to represent the parent "at all subsequent proceedings" ". . . unless relieved by the court upon the substitution of other counsel or for cause." (§ 317, subd. (d).) Counsel for the parents are required to be given "access to all records relevant to the case which are maintained by state or local public agencies" or "by hospitals or by other medical or nonmedical practitioners or by child care custodians . . . ." (§ 317, subd. (f).) The petitioning agency has diminished power "to shape the historical events that form the basis for termination" because it must not only produce clear and convincing evidence that initial removal is necessary but additionally persuade the court that the agency made "reasonable efforts . . . to prevent or to eliminate the need for removal. . . ." (§ 361, subd. (c).) Finally, if the child is removed, there is a statutory presumption that he or she will be returned, with the burden on the state to persuade the court otherwise on multiple occasions. (See, e.g., § 366.21, subd. (e).)

The third factor considered in *Santosky v. Kramer, supra,* 455 U.S. 745, was the governmental interest supporting the procedure—the state's *parens patriae* interest in preserving and promoting the welfare of the child, and the state's fiscal and administrative interest in reducing the cost and burden of such proceedings. In contrast to *Santosky v. Kramer,* our dependency statutes endeavor to preserve the parent-child relationship and to reduce the risk of erroneous fact-finding in so many different ways that it would be fanciful to think that these state interests require what in most cases would be a sixth

inquiry into whether the severance of parental ties would be detrimental to the child. The number and quality of the judicial findings that are necessary preconditions to termination convey very powerfully to the fact finder the subjective certainty about parental unfitness and detriment required before the court may even consider ending the relationship between natural parent and child.

By the time termination is possible under our dependency statutes the danger to the child from parental unfitness is so well established that there is no longer "reason to believe that positive, nurturing parent-child relationships exist" (*Santosky* v. *Kramer, supra,* 455 U.S. at p. 766 [71 L.Ed.2d at pp. 614-615]), and the *parens patriae* interest of the state favoring preservation rather than severance of natural familial bonds has been extinguished. At this point, unlike the situations in *Santosky* v. *Kramer* and *In re Angelia P.,* it has become clear "that the natural parent cannot or will not provide a normal home for the child" (455 U.S. at p. 767 [71 L.Ed.2d at pp. 615-616]), and the state's interest in finding the child a permanent alternate home is fully realized. In light of the earlier judicial determinations that reunification cannot be effectuated, it becomes inimical to the interests of the minor to heavily burden efforts to place the child in a permanent alternative home. By the time of the section 366.26 hearing, no state interest requires further evidence of the consequences to the child of parental unfitness, let alone evidence that meets an elevated standard of proof.

■ Considered in the context of the entire process for terminating parental rights under the dependency statutes, the procedure specified in section 366.26 for terminating parental rights comports with the due process clause of the Fourteenth Amendment because the precise and demanding substantive and procedural requirements the petitioning agency must have satisfied before it can propose termination are carefully calculated to constrain judicial discretion, diminish the risk of erroneous findings of parental inadequacy and detriment to the child, and otherwise protect the legitimate interests of the parents. At this late stage in the process the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must now align itself. Thus the proof by a preponderance standard is sufficient at this point.

We conclude that the standard of proof for termination of parental rights under the child dependency statutes comports with the requirements of due process. Accordingly, we affirm the judgment of the Court of Appeal.

Lucas, C. J., Mosk, J., Arabian, J., Baxter, J., and George, J., concurred.

**KENNARD, J., Dissenting.**—The majority holds that the family relationship between a parent and a minor child can be irrevocably severed using a "preponderance of the evidence" test—the minimum possible standard of proof—in proceedings brought in juvenile court to terminate parental rights. I disagree. In my view, the basic requirements of procedural due process do not allow the state to terminate parental rights in such a proceeding without clear and convincing evidence of a substantial risk of detriment to the child.

I

Sarah D. was born in August 1985. In April 1989, the juvenile court temporarily removed Sarah from the custody and control of her mother, Cynthia D., after a finding that Sarah had suffered, or there was a substantial risk she would suffer, "serious physical harm . . . as the result of [Cynthia's] failure or inability . . . to adequately supervise or protect" Sarah. (Welf. & Inst. Code, §§ 300, subd. (b), 361, subd. (b).)[1]

Thereafter, at a hearing held in May 1991, to reevaluate the status of the temporary removal of Sarah from her mother's custody, the juvenile court found by a "preponderance of the evidence" that it would create a substantial risk of detriment to Sarah to return her to her mother, Cynthia. (§ 366.22.) The court then set the matter for a "selection and implementation" hearing pursuant to section 366.26 to devise a permanent placement plan for Sarah. Among the choices available to the court at the "selection and implementation" hearing would be whether Sarah should be freed for adoption by terminating Cynthia's parental rights with respect to Sarah.

Cynthia immediately challenged the juvenile court's ruling setting the case for a "selection and implementation" hearing, by filing a petition for a writ of mandate or prohibition in the Court of Appeal. Specifically, Cynthia asked the Court of Appeal to prohibit the trial court from terminating her parental rights with respect to her minor child, Sarah. Cynthia argued that the juvenile court's use of the lowest evidentiary standard—proof by a preponderance of the evidence—in making its finding of detriment at the 18-month status review hearing conflicted with decisions by this court and by the United States Supreme Court requiring that the dispositive finding necessary to terminate parental rights be made under a heightened "clear and convincing" evidentiary standard. (*In re Angelia P.* (1981) 28 Cal.3d 908 [171 Cal.Rptr. 637, 623 P.2d 198] [parental unfitness must be proved by clear and convincing evidence]; *Santosky* v. *Kramer* (1982) 455 U.S. 745, 759 [71 L.Ed.2d 599, 610, 12 S.Ct. 1388] [same].) The Court of Appeal denied Cynthia writ relief.

---

[1]Further unlabeled statutory references are to the Welfare and Institutions Code.

We granted Cynthia's petition for review to resolve whether proof by clear and convincing evidence is necessary to terminate parental rights under the juvenile dependency scheme.

II

In 1987, the Legislature enacted Senate Bill No. 243, 1987-1988 Regular Session, which altered aspects of the juvenile dependency law, including the procedures for terminating parental rights in cases involving children who were dependents of the juvenile court. (§ 300 et seq.) The changes reflected the Legislature's concerns that the statutory grounds for removing children from parental custody were too broad and not uniformly applied; that children removed from parental custody spent long periods of time in foster care placements and frequently were subjected to multiple placements; and that parental rights were being terminated without any certainty that the children would ever be adopted. (Sen. Select Com. on Children & Youth, SB 1195 Task Force Rep. on Child Abuse Reporting Laws, Juvenile Dependency Statutes, and Child Welfare Services (Jan. 1988) [hereafter Task Force Report]; see Wald, *State Intervention on Behalf of "Neglected" Children: Standards for Removal of Children From Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights* (1976) 28 Stan.L.Rev. 625, 636-637.) With these concerns in mind, the Legislature narrowed the categories for initial removal of a child from parental custody (§§ 300, 361, subd. (b)); mandated that the state provide the parents social services designed to reunify families (§ 361.5); and provided a swift procedure for terminating parental rights to free a child for adoption once the child was under the jurisdiction of the juvenile dependency system (§§ 366.21, 366.22, 366.26).

Under the new dependency statutes, the status of every child temporarily removed from parental custody must be judicially reviewed once every six months for a period of no more than eighteen months. (§§ 366, 366.21, 366.22.) If, at the 12-month status review hearing, there is no substantial probability the child will be returned to the parents within the next 6 months, or if at the 18-month status review hearing the child is not returned to the parents, the juvenile court must set the matter for a "selection and implementation" hearing under section 366.26 to develop a plan for permanent placement of the child, either in foster care, a guardianship, or adoption. (§§ 366.21, subd. (g), 366.22, subd. (a), 366.26.) For young children and those children for whom adoptive parents are available, adoption is usually the preferred placement because it offers the prospect of a secure permanent home. (See *In re Heather B.* (1992) 9 Cal.App.4th 535, 558 [11 Cal.Rptr. 891].) To free a child for adoption, however, the juvenile court must first terminate the natural parents' rights in the child. (§ 366.26.)

To effectuate the termination of parental rights, the statutory scheme requires the juvenile court to make certain preliminary findings. Thus, at the 12- or 18-month status review hearing, before ordering a section 366.26 "selection and implementation" hearing, the juvenile court must find that the department of social services has offered reasonable reunification services to the child's parents and that return of the child to parental custody poses "a substantial risk of detriment to the physical or emotional well-being" of the child. (§§ 366.21, subd. (e), 366.22, subd. (a).) These statutes expressly provide that the "substantial risk of detriment" need be shown only by a "preponderance of the evidence." After making the required findings at the 12- or 18-month status review hearing and setting the matter for a section 366.26 "selection and implementation" hearing, the juvenile court cannot permanently sever parental rights in a child without also finding, by "clear and convincing evidence," that the child is likely to be adopted. (§ 366.26, subd. (c)(1).) If the court determines that the child is likely to be adopted, however, the court findings made at the earlier 12- or 18-month status review hearing that the child should not be returned to parental custody shall then, in the words of the statute, "constitute a sufficient basis for the termination of parental rights unless the court finds that termination would be detrimental" to the child. (§ 366.26, subd. (c)(1).)

Thus, so long as the minor child is likely to be adopted, the actual court order terminating parental rights is essentially "automatic" at the later section 366.26 hearing. (Task Force Report, *supra*, p. 11.) As the Task Force Report points out, the "critical decision regarding parental rights" under the child dependency scheme is not made when the juvenile court actually terminates parental rights at the section 366.26 hearing, but earlier, at the 12- or 18-month status review hearing, when the court decides that "the minor cannot be returned home and that reunification efforts should not be pursued." (*Ibid.*)

### III

In decisions addressing the evidentiary standard for terminating parental rights, as I mentioned earlier, both this court and the United States Supreme Court have concluded that the finding critical to the termination of parental rights must be supported by clear and convincing evidence.

In *In re Angelia P.*, *supra*, 28 Cal.3d 908, this court considered the standard of proof necessary for terminating parental rights under Civil Code

section 232,[2] which requires a showing of parental unfitness. We concluded that "clear and convincing" evidence of parental unfitness was most consistent with the statutory goal of providing the fullest opportunity for the parents to exercise their rights without impairment of the best interests of the child. (*In re Angelia P., supra,* at p. 919.) One year later, the United States Supreme Court considered the standard of proof used to terminate parental rights under the New York Family Court Act, and concluded that the due process clause of the federal Constitution required proof by clear and convincing evidence. (*Santosky* v. *Kramer, supra,* 455 U.S. at p. 770 [71 L.Ed.2d at pp. 617-618].)

In *Santosky* v. *Kramer, supra,* 455 U.S. 743, the State of New York initiated child neglect proceedings that led the family law court to remove the Santosky's three minor children from parental custody and control. After the children had been dependents of the family law court for almost five years, New York's department of social services asked the court to terminate the parents' rights with respect to the three children. To effect a permanent extinguishment of parental rights, the New York statute required proof of parental unfitness only by a " 'fair preponderance of the evidence.' " (*Id.* at p. 747 [71 L.Ed.2d at pp. 602-603].) But, as the high court pointed out in *Santosky,* due process requires more: "Before a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." (*Id.* at pp. 747-748 [71 L.Ed.2d at pp. 603-604].)

The determination whether a particular evidentiary standard that a state uses to terminate parental rights comports with the constitutional requirements of due process turns on a balancing of three factors that the United States Supreme Court articulated in *Mathews* v. *Eldridge* (1976) 424 U.S. 319, 335 [47 L.Ed.2d 18, 33-34, 96 S.Ct. 893]. As subsequently reiterated by the high court, these factors are: "the private interests affected by the proceeding; the risk of error created by the State's chosen procedure; and the countervailing governmental interest supporting use of the challenged procedure." (*Santosky* v. *Kramer, supra,* 455 U.S. at p. 754 [71 L.Ed.2d at pp. 606-607].)

In considering the first of these factors—the private interest at stake—the United States Supreme Court observed that the interest a parent has in the continued care, custody and control of his or her minor child is a "fundamental liberty interest," which is "commanding" and "far more precious than

---

[2]Civil Code section 232 sets out a procedure for declaring children free of the custody and control of one parent or both. In 1981 when this court decided *In re Angelia P., supra,* 28 Cal.3d 908, section 232 governed all such proceedings, including those involving children who had been declared dependents of the juvenile court. (§ 300 et seq.)

any property right." (*Santosky* v. *Kramer, supra,* 455 U.S. at pp. 758-759 [71 L.Ed.2d at pp. 609-610], citing *Stanley* v. *Illinois* (1972) 405 U.S. 645, 651 [31 L.Ed.2d 551, 558-559, 92 S.Ct. 1208], and *Lassiter* v. *Department of Social Services* (1981) 452 U.S. 18, 27 [68 L.Ed.2d 640, 649-650, 101 S.Ct. 2153].) As the court explained, a state-initiated action to terminate parental rights, "seeks not merely to infringe" this fundamental liberty interest, "but to end it." (*Santosky* v. *Kramer, supra,* 455 U.S. at p. 759 [71 L.Ed.2d at p. 610].)

The *Santosky* court then turned to the second factor of the test set forth in *Mathews* v. *Eldridge, supra,* 424 U.S. at page 335 [47 L.Ed.2d at pages 33-34]—the risk of error created by using a particular procedure. The court found the risk of error in using the lowest burden of proof, "preponderance of the evidence," in a parental rights termination proceeding to be "substantial," especially in light of the grave consequence of total extinguishment of a family relationship that would result from an erroneous ruling in such a proceeding. (*Santosky* v. *Kramer, supra,* 455 U.S. at pp. 758, 764 [71 L.Ed.2d at pp. 609, 613-614].)

Finally, the *Santosky* court considered the third and last factor of the test it had enunciated earlier in *Mathews* v. *Eldridge, supra,* 424 U.S. at page 335 [47 L.Ed.2d at pages 33-34]—the state's countervailing interests in its chosen procedure. In this evaluation, the high court in *Santosky* identified two legitimate interests that the government has in parental termination proceedings: a fiscal and administrative interest in reducing the burdens or costs of the termination proceedings, and a *parens patriae* interest in the preservation and promotion of the child's welfare. (*Santosky* v. *Kramer, supra,* 455 U.S. at p. 766 [71 L.Ed.2d at pp. 614-615].) In both instances, the high court characterized as "comparatively slight" New York's interests in using a lowered evidentiary standard, that of proof by a preponderance of the evidence, in a parental rights termination proceeding. (*Id.* at p. 758 [71 L.Ed.2d at pp. 609-610].)

With respect to the state's fiscal concerns, the court explained in *Santosky* that an elevated standard of proof would not adversely affect that interest. Proof of parental unfitness by clear and convincing evidence, the court observed, is no more costly and does not create any more administrative burdens than proof by a preponderance of the evidence. (*Santosky* v. *Kramer, supra,* 455 U.S. at p. 767 [71 L.Ed.2d at pp. 615-616].) In addressing the state's *parens patriae* interest in the welfare of the child, the high court observed that the statutory scheme at issue in *Santosky,* the New York Family Court Act, sought to preserve natural family bonds whenever possible. (*Santosky* v. *Kramer, supra,* 455 U.S. at p. 767 [71 L.Ed.2d at pp.

615-616].) Use of a "preponderance of the evidence" standard of proof to permanently sever parental rights, the court said, was not consistent with that statutory goal. (*Ibid.*)

After evaluating these three factors—the fundamental private interest at stake in a parental rights termination proceeding, the grave risk of error from a finding of parental unfitness at such a proceeding, and the absence of any overriding governmental interest favoring use of a preponderance of the evidence standard—the United States Supreme Court in *Santosky* concluded that to permanently terminate parental rights under the New York statute, due process required that the dispositive finding of parental unfitness be established by at least "clear and convincing" evidence. (*Santosky* v. *Kramer*, *supra*, 455 U.S. at p. 769 [71 L.Ed.2d at pp. 616-617].)

Thus, in *Santosky* v. *Kramer*, *supra*, 455 U.S. at page 769 [71 L.Ed.2d at pages 616-617], application of the three-factor test of *Mathews* v. *Eldridge*, *supra*, 424 U.S. at page 335 [47 L.Ed.2d at pages 33-34], supported the use of a standard of proof higher than that of "preponderance of the evidence" in an action to terminate parental rights under the New York Family Court Act. The issue in this case is whether consideration of those same three factors— the private interest at stake, the risk of an erroneous determination, and the countervailing governmental interests—supports a contrary result when an action to terminate parental rights is brought under California's amended enacted juvenile dependency statutes. I, unlike the majority, conclude it does not.

### IV

The majority considers the California dependency procedures for terminating parental rights in light of the factors the United States Supreme Court specified in *Mathews* v. *Eldridge*, *supra*, 424 U.S. at page 335 [47 L.Ed.2d at pages 33-34], and concludes that due process does not require use of the stricter standard of proof by clear and convincing evidence to terminate parental rights under that statutory scheme. (Maj. opn., *ante*, at p. 256.) According to the majority, to require an "elevated standard of proof" at the section 366.26 "selection and implementation" hearing, would "heavily burden efforts to place the child in a permanent home." (Maj. opn., *ante*, at p. 256.)

But Cynthia, the child's mother, does not contend that due process compels an elevated standard of proof at the section 366.26 "selection and implementation" hearing. Rather, her argument is that a higher standard of proof by clear and convincing evidence must be applied to the dependency

court's *final* decision not to return a child to parental custody, either at the 12- or 18-month status review hearing. (§§ 366.21, subd. (e), 366.22, subd. (a).) The Task Force Report prepared for the California Senate calls this the "critical decision" in terminating parental rights under the California dependency statutes because it is the last substantive evaluation necessary to the juvenile court's termination of parental rights. (Task Force Report, *supra*, p. 11.) By ignoring the decision critical to terminating parental rights and instead focusing on a later phase of the dependency procedures—the section 366.26 "selection and implementation" hearing—the majority skews its evaluation of the three-factor test of *Mathews* v. *Eldridge, supra,* 424 U.S. at page 335 [47 L.Ed.2d at pages 33-34], to favor the lower standard of proof by a preponderance of the evidence. But use of that lower standard of proof does not withstand scrutiny when the test the high court established in *Mathews* v. *Eldridge, supra,* is applied to the critical decision in terminating parental rights under the California juvenile dependency scheme, as I shall explain.

V

Under the test that the United States Supreme Court established in *Mathews* v. *Eldridge, supra,* 424 U.S. at page 335 [47 L.Ed.2d at pages 33-34], to determine whether state procedures that work a deprivation comport with due process, the first factor to be considered is the private interest affected by the threatened deprivation. In an action initiated by the state to terminate parental rights, the private interest at stake is a parent's "fundamental" and "commanding" liberty interest in maintaining a parent-child relationship with the child. (*Santosky* v. *Kramer, supra,* 455 U.S. at pp. 758-759 [71 L.Ed.2d at pp. 609-610].) Irrespective of whether state proceedings to terminate parental rights are brought under the New York Family Court Act at issue in *Santosky,* under the California Civil Code provision this court considered in *In re Angelia P., supra,* 28 Cal.3d 908, or under the California juvenile dependency statutes, the private interest at stake is just as "fundamental" and "commanding." Nor is the threatened deprivation any less permanent for the parents or for the child when, as here, the state initiates proceedings to terminate parental rights under California's juvenile dependency statutes. Thus, the private interest affected when parental rights are threatened in a juvenile court dependency action supports using the same standard of proof required to terminate parental rights under the New York and the California Civil Code procedures—proof by clear and convincing evidence.

I now turn to the second factor of the test set forth in *Mathews* v. *Eldridge, supra,* 424 U.S. at page 335 [47 L.Ed.2d at pages 33-34]: the risk that using

the "preponderance of the evidence" standard in the California juvenile dependency scheme may lead to an erroneous deprivation of parental rights. In *Santosky* v. *Kramer, supra,* 455 U.S. at page 761 [71 L.Ed.2d at pages 611-612], the United States Supreme Court held that the prospect for an erroneous deprivation of parental rights based on proof by a preponderance of the evidence, the standard adopted by the New York Family Court Act, was "significant." In part, the high court's conclusion rested on the state's superior ability to assemble its case and the potential for cultural or class bias against the parents who, in most termination proceedings, are "poor, uneducated, or members of minority groups." (*Id.* at pp. 763-764 [71 L.Ed.2d at pp. 612-615].)

Although California's juvenile dependency procedures for terminating parental rights differ in certain respects from the procedures under the New York Family Court Act, those differences do not appreciably diminish the potential risk of making an erroneous determination on the critical question under the California juvenile dependency scheme: whether the child should be returned to the parent(s). When termination of parental rights is at issue under the California dependency statutes, the child will always be a dependent of the court and not in parental custody. This situation tends to magnify the state's ability to marshall its case. Moreover, the potential for class or cultural bias in a decision that will result in freeing a child for adoption by a family with greater resources than the natural parents is no less acute in California than in New York.

As the United States Supreme Court explained in *Santosky* v. *Kramer, supra,* 455 U.S. 745, increasing the burden of proof on the state at the critical phase of the proceedings to terminate parental rights " 'is one way to impress the factfinder with the importance of the decision' " and to thereby reduce the risk that parental rights will be erroneously extinguished. (*Id.* at pp. 764-765 [71 L.Ed.2d at p. 614], quoting *Addington* v. *Texas* (1979) 441 U.S. 418, 427 [60 L.Ed.2d 323, 331-332, 99 S.Ct. 1804].) The rights at issue in any parental termination proceeding are just too important to take an unnecessary risk.

The third and final factor of the test articulated in *Mathews* v. *Eldridge, supra,* 424 U.S. at page 335 [47 L.Ed.2d at pages 33-34], is the government's interest in its chosen procedure. With respect to an action brought to terminate parental rights, the government has not only an interest in avoiding added fiscal and administrative burdens that an additional procedural requirement might entail, but also a *parens patriae* interest in the child's welfare. (See *Santosky* v. *Kramer, supra,* 455 U.S. at p. 754 [71 L.Ed.2d at pp. 606-607].)

As to the fiscal or administrative burden, the high court has stated that "a stricter standard of proof would reduce factual error without imposing substantial fiscal burdens" on the state, and rejected the notion that employing a higher standard of proof in parental rights termination proceedings would "create any real administrative burdens . . . ." (*Santosky* v. *Kramer, supra*, 455 U.S. at p. 767 [71 L.Ed.2d at pp. 615-616].) The same is no less true under the California juvenile dependency statutes in this case.

The *parens patriae* interest that is at stake at a 12- or 18-month status review under California's juvenile dependency scheme is the state's interest in reunifying the child with its natural parents, if possible. (§§ 366.21, subd. (e), 366.22, subd. (a).) But the degree of accuracy in achieving that interest is *enhanced*, not impaired, by the use of a "clear and convincing" evidentiary standard to determine whether return of the child to parental custody would, in the terms of the statutory language, "create a substantial risk of detriment to the physical or emotional well-being" of the child. (*Ibid.*)

To summarize, application of the three-factor test that the United States Supreme Court established in *Mathews* v. *Eldridge, supra*, 424 U.S. at page 335 [47 L.Ed.2d at pages 33-34], would best promote factual certainty in making the finding that is critical to terminating parental rights, while striking a fair balance between the competing interests of the parents and the state. Accordingly, I would hold that for the juvenile court to terminate parental rights with respect to a minor child at a section 366.26 "selection and implementation" hearing, clear and convincing evidence must support the finding made at the last status review hearing that returning the child to parental custody posed a substantial risk of detriment to the child.

CONCLUSION

I would reverse the judgment of the Court of Appeal, with directions to remand this matter to the trial court for a reevaluation of the evidence presented at the 18-month status review hearing, based on the use of a "clear and convincing" evidentiary standard.

Petitioner's application for a rehearing was denied July 29, 1993. Kennard, J., was of the opinion that the application should be granted.