[No. G012591. Fourth Dist., Div. Three. Oct. 29, 1993.]

In re BRITTANY M., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and
Respondent, v.
LAURA G., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b), parts III and IV of this opinion (except the final dispositional sentence) are not published, as they do not meet the standards for publication.

## COUNSEL

John L. Dodd and Karen J. Dodd, under appointments by the Court of Appeal, for Defendant and Appellant.

Terry C. Andrus, County Counsel, and Michelle Ben-Hur, Deputy County Counsel, for Plaintiff and Respondent.

Harold La Flamme and Duane T. Neary, under appointments by the Court of Appeal, for Minor.

## OPINION

**SONENSHINE, J.**—On August 19, 1993, the Supreme Court, having accepted this case for review, issued its order directing us to reconsider our decision in light of *Cynthia D.* v. *Superior Court* (1993) 5 Cal.4th 242 [19 Cal.Rptr.2d 698, 851 P.2d 1307]. In *Cynthia D.*, the question was whether Welfare and Institutions Code section 366.26[1] offends due process rights by allowing the juvenile court to terminate parental rights based on detriment findings made by a preponderance of evidence at earlier stages of the dependency proceedings. Section 366.26, subdivision (c)(1) provides that, barring the existence of certain enumerated circumstances, if the court determines a minor is adoptable, ". . . the findings . . . pursuant to Section 366.21 or Section 366.22 that a minor cannot or should not be returned to his or her parent or guardian, shall then constitute a sufficient basis for termination of parental rights. . . ." Under section 366.21, subdivision (e), at the six-month review hearing, the court shall order the return of a dependent minor to the physical custody of his or her parents unless, by a preponderance of evidence, it finds return would create a substantial risk of detriment to the minor's physical or emotional well-being. The same standard applies at the 12-month review hearing (§ 366.21, subd. (f)), and, should the matter be continued, at the 18-month hearing. (§ 366.22, subd. (a).)

The *Cynthia D.* court concluded the statute passes muster: "Considered in the context of the entire process for terminating parental rights under the dependency statutes, the procedure specified in section 366.26 for terminating parental rights comports with the due process clause of the Fourteenth Amendment because the precise and demanding substantive and procedural requirements the petitioning agency must have satisfied before it can propose termination are carefully calculated to constrain judicial discretion, diminish the risk of erroneous findings of parental inadequacy and detriment to the child, and otherwise protect the legitimate interests of the parents. At this late stage in the process the evidence of detriment is already so clear and convincing that more cannot be required without prejudice to the interests of the adoptable child, with which the state must now align itself. Thus the

[1]All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

proof by a preponderance standard is sufficient at this point." (*Cynthia D.* v. *Superior Court, supra,* 5 Cal.4th 242, 256.)

In our pre-*Cynthia D.* opinion in this appeal, the majority concluded a court's order terminating parental rights must be based on clear and convincing evidence that return of the minor to the parent would be detrimental to the child's welfare. Because the juvenile court failed to articulate the standard of proof it had applied to its detriment finding, we presumed it applied the lesser standard of preponderance of evidence. Consequently, we reversed and remanded the matter for the juvenile court to determine whether the evidence met the clear-and-convincing test. We declined to reach the merits of other issues raised by Laura.

Laura acknowledges, as she must, that stare decisis compels us to follow *Cynthia D.* (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]), insofar as it holds a preponderance of evidence standard sufficient to meet due process requirements.[2] She urges reversal, however, on constitutional grounds we found unnecessary to address earlier: (1) An order terminating parental rights without any finding of unfitness is constitutionally infirm; and (2) section 366.26 violates the equal protection clauses of the United States and California Constitutions because parents whose rights are terminated under that statute are treated differently than parents whose rights are terminated under Civil Code section 232. Laura further reasserts her initial challenge to the sufficiency of evidence to support the court's findings regarding adoptability of Brittany and lack of benefit in her continuing relationship with Laura.[3]

### Facts and Procedures

Brittany was born on April 14, 1990, suffering upper extremities high tone, severe respiratory distress and sepsis. Laura had a positive toxicology screen for cocaine on the day of Brittany's birth, and she admitted a history of intravenous and nasal cocaine ingestion during the first seven months of her pregnancy. The minor was taken into protective custody,[4] and a

---

[2] In an excess of caution, Laura reasserts her due process arguments solely "to preserve them for review by the United States Supreme Court."

[3] There is no issue on appeal regarding the sufficiency of evidence to support detriment findings made at the review hearings.

[4] Brittany was Laura's third child. Her first, four-year-old Frank, was detained a month before Brittany's birth when he was left in the care of Brittany's father, Danny M. At that time, Laura was in jail and Danny was unemployed, homeless and begging on the streets. Laura's second child, Nikki, died from sudden infant death syndrome (SIDS) at the age of one month. Laura received no regular prenatal care during her pregnancy with Brittany.

Danny's paternal rights are not an issue in this appeal.

dependency petition was filed under section 300, subdivisions (a) and (b).[5] In addition to reciting the infant's precarious medical condition,[6] the petition alleged the father's lengthy history of arrests and the parents' unresolved history of controlled substance abuse, unemployment and inability to provide the minor with the necessities of life.

The court ordered Brittany detained on April 23. She remained in the hospital until late May. During that interval, Laura visited the infant nine times. Twice she was observed handling the child inappropriately. Despite the need for care of intravenous tubes and other apparatus, she wrapped and unwrapped Brittany's covers repeatedly and passed the infant back and forth with the father. She was aggressive and hostile when nurses suggested how she should wrap and hold the baby. On a third occasion, a nurse reported: "Parents and grandparents in and very hyper with babe; all had liquor odor about them and it was necessary to quiet and calm them three times."

Brittany was discharged on an apnea monitor and placed in a high risk medical foster care home. Laura failed to appear at her first scheduled visit, showed up for the next two, canceled the next one due to illness and then failed to keep the next date as rescheduled and confirmed.[7]

A default judgment was entered against Laura on August 1, after she repeatedly failed to appear on prior hearing dates. The petition's allegations were found true by a preponderance of evidence, Brittany was declared a dependent of the juvenile court and ordered into out-of-home placement, and a reunification service plan was adopted.

---

[5]Section 300, subdivision (a) permits the juvenile court to take jurisdiction when a minor "has suffered, or there is a substantial risk that the minor will suffer, serious physical harm inflicted nonaccidentally . . . by the minor's parent."

Section 300, subdivision (b) provides for jurisdiction where a child "has suffered, or there is a substantial risk the minor will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the minor, or the willful or negligent failure of the minor's parent . . . to adequately supervise or protect the minor from the conduct of the custodian with whom the minor has been left, or by the willful or negligent failure of the parent . . . to provide the minor with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent . . . to provide regular care for the minor due to the parent's . . . substance abuse."

[6]Brittany was designated a high risk medical case by the Orange County Social Services Agency (SSA). She suffered from respiratory distress and sepsis, eating difficulties and nasal regurgitation. Eventually, she was diagnosed as suffering from a cleft palate and other congenital abnormalities which resulted in delayed speech development and necessitated corrective surgery.

[7]One excuse offered by Laura for her failure to show up for a visit as promised was a "stabbing incident" involving an attack on her and Danny by several men at a Costa Mesa motel. After the social worker checked the police report, she noted: "[T]he minor's mother lied about the date of the stabbing incident involving herself and the minor's father. Mother used the incident as an excuse for not attending the May 24, 1990 visit with the minor when in fact the stabbing incident did not occur until three days later."

Laura continued her pattern of sporadic visitation. In the interim between July 1990 and the scheduled 12-month review hearing,[8] despite an open-door policy, Laura scheduled visits only about 3 times a month, and then failed to keep one-third of the appointments. She believed the caretaker had "spoiled" Brittany and planned on eliminating contact between the two. She made no inquiry about the child's daily routine or special needs. She knew Brittany would require ongoing medical care, yet she never accompanied the minor to her medical appointments. She had no specific plans for day care if Brittany were returned to her. She intended to have her new husband take care of the child until she found a day-care or preschool program.[9]

Laura failed to perform satisfactorily with regard to a number of other tasks specified in the reunification plan.[10] She attended less than one-half of the parenting classes and was dropped from the perinatal class as a no-show who failed to complete orientation. She did not become involved in counseling or a drug treatment program. Although a condition of her being allowed unmonitored visits with Brittany was that she take care of all of her arrest warrants, two warrants remained outstanding because, as Laura stated, she forgot about them. She attended Alcoholics Anonymous meetings, but only as a member of Al-Anon, a group comprised of spouses or relatives of alcoholics. She said she went to the meetings because she heard "that people who come from dysfunctional families may have a tendency [toward alcoholism]." She also said she participated in the program to support her husband, Paul G. She submitted to drug testing at a facility of her own choosing three times, all within a six-day period. But the specimens tested at that facility were not obtained under observation: There was no verification of the identity of the donor or the time of taking of the specimen. Laura denied any current or past substance abuse problem, but admitted to "experimenting" with drugs and using cocaine through her seventh month of pregnancy.

[8]The six-month review hearing took place on January 7, 1991. The court found by a preponderance of evidence, pursuant to section 366.21, subdivision (e), that the minor could not be returned home due to substantial risk of detriment to her physical or emotional well being. It found continued out-of-home placement appropriate and necessary in that no substantial progress had been made toward alleviating or mitigating the causes necessitating Brittany's placement, and, despite reasonable services having been provided or offered to the parents, they had not substantially complied with the service plan.

[9]The husband, Paul G., had a criminal history involving sexual assault. That fact did not concern Laura with respect to the safety of Brittany because it involved an assault on the mother of Paul's son, and Paul was simply present when the assault occurred. Laura's visits with Brittany were monitored, in part because of Paul G.'s history and in part because of Laura's own outstanding warrants.

[10]There is no issue in this appeal as to the adequacy of reunification services offered to Laura, no doubt because the record gives witness to extraordinary, but ultimately futile, efforts by the SSA to accommodate Laura's expressed needs and give her a multitude of options.

After the contested 12-month review hearing, which was ultimately continued from its July date to October 15, and then trailed to November 4, 14 and 22, the court found Laura had not complied with the reunification service plan, reasonable reunification services had been offered or provided to her, and it would be detrimental to return Brittany to her custody. At the selection and implementation hearing on March 25, 1992, the SSA filed a supplemental report, referring to Brittany's case and the related case of her half brother, Frank. The report stated: "The minors' mother has made some efforts to stabilize her housing situation and to have sporadic visitation with the minor. However, the minor's mother has not resolved or gone into therapy for the basic issues that brought the minors to the attention of this Court, which was the minors' mother's substance use. The minors' mother has not completed any parenting classes. The minor, Brittany, has not had any unmonitored visits with her mother and there appears to be no bond between the minor and her mother. [¶] . . . [T]he minors' mother has no comprehension that she needs child care during her working hours, believing that the minors could just 'hang out' at the swap meet while she works. It does not appear that Brittany's mother can comply with a drug treatment program and complete parenting classes and establish a bond and relationship with this toddler that would indicate that there is any hope for reunification."

At the conclusion of the section 366.26 hearing, the court terminated Laura's parental rights. It found Brittany to be adoptable and referred the matter to adoptions for placement. Visits between Brittany and Laura were terminated.

*Discussion*

I

■ Laura contends section 366.26 deprives her of a due process right by failing to require the court to make an express finding of parental unfitness. She argues the *Cynthia D.* court was not asked to, and therefore did not, decide this precise issue. In a strictly technical sense, she may be correct; but the court obviously addressed the subject at great length. It stated: "Turning to the current statutory scheme, section 366.26 cannot properly be understood except in the context of the entire dependency process of which it is part. . . . [T]he purpose of the section 366.26 hearing is not to accumulate *further* evidence of parental unfitness and danger to the child, but to begin the task of finding the child a permanent alternative family placement. *By the time dependency proceedings have reached the stage of a section 366.26 hearing, there have been multiple specific findings of parental unfitness.*

Except for a temporary period, the grounds for initial removal of the child from parental custody have been established under a clear and convincing standard [citation]; in addition, there have been a series of hearings involving ongoing reunification efforts and, at each hearing, there was a statutory presumption that the child should be returned to the custody of the parent. [Citations.] Only if, over this entire period of time, the state continually has established that a return of custody to the parent would be detrimental to the child is the section 366.26 stage even reached." (*Cynthia D.* v. *Superior Court, supra,* 5 Cal.4th 242, 253; fn. omitted, italics added.)

The *Cynthia D.* court added: "It is not the purpose of the section 366.26 hearing to show parental inadequacy, which had to have been previously established, and there is no burden on the petitioning agency to show at the section 366.26 hearing that the parents are 'at fault.'" (*Cynthia D.* v. *Superior Court, supra,* 5 Cal.4th 242, 254.) The court touched on the subject again when it noted: "By the time termination is possible under our dependency statutes *the danger to the child from parental unfitness* is so well established that there is no longer 'reason to believe that positive, nurturing parent-child relationships exist' [citation] . . ." (*Id.* at p. 256, italics added.)

Perhaps the above language is, as Laura claims, dictum. But dictum may control the disposition of a given case. (See *Hickman* v. *Mulder* (1976) 58 Cal.App.3d 900, 902 [130 Cal.Rptr. 304].) And even if the extended discussion of parental unfitness does not have the force of binding precedent, we do not deem it "inadvertent, ill-considered or a matter lightly to be disregarded." (*Jaramillo* v. *State of California* (1978) 81 Cal.App.3d 968, 971 [146 Cal.Rptr. 823.) Indeed, we find it highly germane and compellingly persuasive.

We conclude section 366.26 does not violate a parent's right to due process in failing to mandate an express finding of parental unfitness. The detriment findings made at each review hearing preceding the section 366.26 hearing (§§ 366.21, subds. (e), (f), 366.22, subd. (a)) sufficiently establish parental unfitness to satisfy due process requirements.

## II

Laura argues section 366.26 violates equal protection because parents whose rights are terminated under that statute are treated differently than are parents whose rights are terminated under Civil Code section 232, i.e., a showing of parental unfitness is necessary under the latter statute, but

not under the former. We reject the argument, which has been directly or inferentially addressed and rejected in a number of recent cases.

"The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].) But, as stated recently in *In re Vanessa W.* (1993) 17 Cal.App.4th 800, 807 [21 Cal.Rptr.2d 633]: "Because dependency hearings under the Welfare and Institutions Code and those under Civil Code section 232 are ' "separate and distinct [proceedings], each serving an entirely different purpose," ' [citation], parents subject to the two different proceedings are not similarly situated." *The Cynthia D.* court makes essentially the same point: "A Civil Code section 232 proceeding to terminate parental rights is heard in the superior court as a new action in which the superior court must find by clear and convincing evidence the existence of statutorily specified grounds of parental fault. [Citation.] The higher standard of proof is appropriate in light of the fact that this is a separate proceeding in which specific findings of fault or detriment are required. The present statutory scheme, by contrast, requires the juvenile court to conduct multiple hearings and findings of detriment before the section 366.26 stage is reached. Thus the Civil Code section 232 proceeding is not comparable to a proceeding pursuant to section 366.26 in which parental rights are terminated." (*Cynthia D. v. Superior Court, supra,* 5 Cal.4th 242, 253, fn. 8.)

Additionally, as discussed above, section 366.26, like Civil Code section 232, *does* require a showing of parental unfitness prior to termination of parental rights, albeit the showing is sufficiently established along the way to the section 366.26 hearing, rather than by an express finding at the time of the hearing. Therefore, we agree with the conclusion reached by the court in *In re Edward R.* (1993) 12 Cal.App.4th 116, 124 [15 Cal.Rptr.2d 308]: "[P]arents whose rights are subject to termination under Civil Code section 232, subdivision (a)(7) do not receive greater safeguards than those whose rights may be terminated according to the new [section 366.26] statutory scheme."

III., IV.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

*See footnote, *ante*, page 1396.

The judgment is affirmed.

Moore, Acting P. J., and Wallin, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 13, 1994.