[No. D054188. Fourth Dist., Div. One. July 9, 2009.]

In re JASON J., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
WILLIE S., Defendant and Appellant.

**COUNSEL**

Maryann M. Milcetic for Defendant and Appellant.

John J. Sansone, County Counsel, John E. Philips, Chief Deputy County Counsel, Gary C. Seiser, Katharine R. Bird and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and Respondent.

Amanda Benedict for Minor.

**OPINION**

**McCONNELL, P. J.**—Willie S. appeals a juvenile court judgment terminating his parental rights over Jason J. and choosing adoption as the preferred permanent plan. Willie contends he is a father within the meaning of *Adoption of Kelsey S.* (1992) 1 Cal.4th 816 [4 Cal.Rptr.2d 615, 823 P.2d 1216] (*Kelsey S.*), and thus the court violated his due process rights by terminating

his parental rights without making an express finding of unfitness. Alternatively, he contends the court may not terminate the parental rights of a mere biological father absent a finding of unfitness. Additionally, he challenges the sufficiency of the evidence to support the court's finding that the parent-child beneficial relationship exception to adoption is inapplicable. (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).)[1] We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Shanna M. is Jason and Kathryn M.'s mother, and Jamal J. was Shanna's live-in boyfriend. On February 21, 2007, Shanna called 911, believing Jamal had attempted to drown one-year-old Jason in the bathtub. Shanna walked into the bathroom and "saw Jamal over Jason and Jason's eyelids were blue and he was lethargic," and she heard Jamal say "that's what you get for breaking my cigarettes." (Italics omitted.) When police arrived, they noted a strong marijuana odor, and thus they requested a toxicology screen for the children. They also arrested Jamal for domestic violence based on Shanna's report that he had hit her two to three weeks earlier. He remained incarcerated throughout the proceedings.

Jason tested negative for drugs, but the examining doctor found a bruise on his left thigh consistent with nonaccidental injury. The San Diego County Health and Human Services Agency (the Agency) removed the children from the home and filed dependency petitions on their behalf. Jason's petition alleged he had been exposed to violent confrontations in which Jamal punched Shanna in the head several times, giving her a black eye, and Jason was found with injuries consistent with abuse or neglect. Shanna named Jamal as Kathryn's father and Willie as Jason's father.

Shanna told the social worker she had used marijuana and crystal methamphetamine, but she voluntarily joined Narcotics Anonymous and had been clean for four months. She admitted, however, the recent use of alcohol. Shanna's sister Nina advised the social worker that Jamal had abused Shanna other times. Shanna would make Jamal leave the house, but she would always let him return. The social worker later learned Shanna tested positive for methamphetamine when she gave birth to Kathryn a few months earlier.

Willie reported to the social worker that "he loves his son and he wants what is best for [Jason] and he believes his son should be with his mother. He said he is not in a position to be his son's caregiver but if the mother does not get him back right away he would like for Jason to be with his aunt Nina." Willie "used very affectionate . . . words . . . when describing Jason and

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

stated the mother told him that Jason was his son when Jason was little. He stated in the beginning Jason did not look like him but now he does; however, he would still like to take a paternity to know for sure if he is Jason's father."

Jamal signed a paternity declaration that stated Shanna told him he is Jason's father. Willie signed a paternity declaration that stated the same thing. Willie's declaration also stated he had neither lived with nor supported Jason, he did not agree to have his name on the birth certificate and he was unsure of whether he was the father. The court appointed an attorney for him and ordered genetic testing. The test established Willie's paternity, and on June 6, 2007, the court entered a judgment of paternity. At the jurisdiction and disposition hearing, the court declared the children dependents and placed them in a relative's care, and ordered reunification services for Shanna.

At a June 27, 2007, hearing, the court authorized reunification services for Willie. He did not attend the hearing but his attorney advised the court he was opposed to participating in any services. The attorney stated Willie told him, "I'm not in a position to request custody today. I'm not working and I'm just not in a position to physically take custody." The court advised the attorney that if Willie did not participate in services, it could hinder any later attempt to obtain custody.

Willie telephoned the social worker on September 13, 2007, and stated he felt no need to participate in counseling, a parenting class or substance abuse education or treatment, as outlined in his case plan. "He stated that he would like placement, but that he had done services several years back with another child, and he felt that the Agency was using his past against him, and setting up obstacles for him." On September 21 the social worker called him, and he reported he was in Dallas, Texas, looking for a job. He did not mention Jason or any plans to reunify with or care for him. On October 3 the social worker spoke with Willie again and he was still in Dallas. He had heard the Agency was considering placing both Jason and Kathryn with Jamal's family, and he objected to that possibility insofar as Jason was concerned. Willie told the social worker he was interested in placement, and she reminded him "about the [A]gency's expectations for services, and [that it had] questions as to why he did not request placement early on." Willie responded that before he knew Jason was his son "he did not want to get attached to [the] child, and then learn that it was not his, because that would be 'too devastating.' " Willie said he would participate in services if it would result in Jason's placement with him. However, he never did so.

In an October 16, 2007, report for the six-month review hearing, the Agency recommended the termination of reunification services and the scheduling of a permanency planning hearing under section 366.26. Shanna

was not in compliance with any component of her reunification plan and Willie remained in Dallas. The Agency learned Willie was charged with a drug offense in 2001, he completed a drug treatment program in 2004, and it "appears [he] is a registered gang member [by court order] until 2018."

The court continued the six-month review hearing to December. It also ordered Shanna to enroll in SARMS (the Substance Abuse Recovery Management System).

On November 5, 2007, sometime after moving back to San Diego, Willie called the social worker and requested a visit with Jason. The Agency provided him with supervised visits.

The court again continued the six-month review hearing. In December 2007 the Agency filed a supplemental petition under section 387, explaining the children's placement with a relative was no longer appropriate because Shanna had taken the children from the relative's home. The Agency placed the children in foster care.

In a December 2007 report, the Agency noted Shanna was not in compliance with her case plan. The report advised that Willie "continues to deny the protective issues regarding the mother. He feels the mother is a 'good mom' and he does not understand why he would be expected to protect the child from the mother. He states the [A]gency is victimizing the mother 'for reaching out for help.' He was offered services, but declined them, saying he has done services before with his daughter, and he does not need to do them now."

On June 4, 2008, a combined hearing was held on the section 387 petition and six-month review. Shanna did not attend and her whereabouts were unknown. Willie's attorney explained he was absent because he had a new job. The attorney advised the court that Willie had "changed his position and is now asking for custody of his son." Willie sought a continuance but the court denied it, commenting that he "sat on the sideline the entire time here. He never formally requested custody. He is not engaged in services . . . ." The court explained it was Willie's burden to show changed circumstances: "[I]f he can show evidence he is ready, willing, and able and it's in the best interest of this child to be placed with him today, the child can be placed with him today, but that's his burden."

The social worker, Stefanie Blue, testified she had reviewed the visitation logs but had not observed visits between Willie and Jason. The logs indicated Willie had consistently visited Jason since about the second week in December 2007 and the visits were favorable. Willie acted appropriately, he was

attentive and showed age-appropriate interaction with Jason, he looked out for Jason's well-being and he brought toys and food for Jason. Jason greeted Willie with a smile and a hug, called Willie "Daddy" and spontaneously told Willie, "I love you." Blue had no information that Willie lacked parenting skills, and said, "I think the basic parenting skills are adequate."

Blue believed it was not in Jason's best interest to be placed with Willie. She was primarily concerned that Willie and Shanna continued to have contact, and Shanna was not participating in any services. Shanna was seen dropping Willie off for visits with Jason, and she reported that she had been out drinking with Willie and he was in the car with her when she was arrested for driving under the influence. Blue had explained to Willie many times about the risk of Jason's exposure to Shanna, and Willie had "gone back and forth from saying he wants the child with the mother to why can't he be with me then, and then just declaring his mother the best placement, so he's wavered back and forth." The last time Blue spoke with Willie on the matter, "he felt the kids should be with their mother." Blue was also concerned that he declined services and felt they were unnecessary, he did not seek placement from the beginning of the proceedings, and he was a registered gang member but he was not forthcoming about his personal life. Further, he left town and returned to town without notifying her.

The court sustained the allegations of the section 387 petition and continued Jason as a dependent. The court found that return of Jason to Shanna would create a substantial risk of detriment to his physical and emotional well-being. The court determined by clear and convincing evidence there was no change in circumstances nor that it would be in Jason's best interest to be placed with Willie, adding that "he's had over a year to try to [get custody], and his preference would be to give [Jason] to the mom so he can continue to have a nice two-hour, three-hour visitation and kind of play the nice dad, but that is not what being a father is about."

In its assessment report the Agency, through social worker Jessica Schmidt, explained Jason and Kathryn "are adorable siblings" who are adoptable "due to their young age, engaging personalities, ability to form attachments, and overall minimal level of care required to meet their needs." Their caretaker was committed to adopting them, and there were 16 other approved families in San Diego County willing to adopt siblings like Jason and Kathryn. The report states that "Jason enjoys seeing [Willie] and enjoys his time with [Willie]. However, Jason does depart easily from [Willie] after visits and Jason also does not look to [Willie] to meet his daily needs."

At the November 20, 2008, permanency planning hearing, Schmidt testified she had observed five visits between Willie and Jason. Jason called Willie "Daddy" and was happy to see Willie. When visits were over Jason "usually says good-bye and sometimes he gives a hug and a kiss, and sometimes he's okay just to wave good-bye at the door." After one visit Jason clung to Schmidt and did not want to go to Willie to tell him good-bye. Overall, Jason "separates fairly easily and is okay emotionally when he departs." Schmidt agreed Willie usually behaved appropriately with Jason, and he was gentle and caring toward his son. Once when Jason threw a tantrum, however, Willie "pointed to his belt, and he said this is for you [Jason], and the monitor had to intervene at that time and say that he can only use time-outs as appropriate discipline."

The court found it likely the children will be adopted, and determined none of the exceptions to adoption is applicable. The court terminated parental rights and chose adoption as the preferred permanent plan.

## DISCUSSION

### I

### *Finding of Unfitness*[2]

### A

Willie contends he is a father within the meaning of *Kelsey S., supra,* 1 Cal.4th 816, and the court violated his due process rights by terminating his parental rights without ever making an express finding of unfitness. Alternatively, he contends that if he does not qualify as a so-called *Kelsey S.* father, the court could not terminate his rights as a mere biological father absent a finding of unfitness.[3] We disagree with both points.

 Under California dependency law, presumed fathers have greater rights than mere biological fathers. (*In re Zacharia D.* (1993) 6 Cal.4th 435,

---

[2] A finding of detriment to the child is equivalent to a finding of parental unfitness. (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253 [19 Cal.Rptr.2d 698, 851 P.2d 1307] (*Cynthia D.*).)

[3] A finding of parental unfitness is not part of a section 366.26 hearing. (*In re Sarah C.* (1992) 8 Cal.App.4th 964, 979 [11 Cal.Rptr.2d 414].) "The court is required only to find that clear and convincing evidence establishes the child is likely to be adopted, reunification services were properly terminated or not offered, and termination of parental rights would not be detrimental to the child for certain extraordinary circumstances . . . before ordering adoption and terminating parental rights." (*Ibid.*) Willie claims a finding of unfitness was required at the section 366.26 hearing here, however, because the court never made such a finding earlier in the proceedings. (See *Cynthia D., supra,* 5 Cal.4th at p. 253.)

448, 451 [24 Cal.Rptr.2d 751, 862 P.2d 751] (*Zacharia D.*).) For instance, "only a presumed, not a mere biological, father is a 'parent' entitled to receive reunification services . . . ." (*Id.* at p. 451.)

A man is a presumed father if he meets the criteria of Family Code section 7611. Under that statute, "a man who has neither legally married nor attempted to legally marry the mother of his child cannot become a presumed father unless he *both* 'receives the child into his home *and* openly holds out the child as his natural child.' " (*Adoption of Michael H.* (1995) 10 Cal.4th 1043, 1051 [43 Cal.Rptr.2d 445, 898 P.2d 891]; see *Zacharia D., supra,* 6 Cal.4th at p. 449 [" 'parental rights are generally conferred on a man not merely based on biology but on the father's connection to the mother [and/or] child through marriage (or attempted marriage) or his commitment to the child' . . ." (citation omitted)]; Fam. Code, § 7611, subd. (d).) A "biological or natural father is one whose biological paternity has been established, but who has not achieved presumed father status as defined in [Family Code section 7611]." (*Zacharia D., supra,* at p. 449, fn. 15.)[4]

Willie is not a presumed father within the meaning of Family Code section 7611, and he does not argue otherwise. Rather, he claims for the first time on appeal that he is a father within the meaning of *Kelsey S., supra,* 1 Cal.4th 816. He forfeited appellate review of the issue, however, by not raising it at the juvenile court. A "party seeking status as a father under *Kelsey S.* must be clear he wants to be so declared." (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 582 [25 Cal.Rptr.3d 774].) In any event, even without forfeiture his claim lacks merit.[5]

▪ To qualify as a *Kelsey S.* father, a biological father must show he promptly stepped forward to assume full parental responsibilities for the child's well-being, including a financial, emotional or other commitment; the child's mother thwarted his efforts to assume his parental responsibilities; and he demonstrated a willingness to assume full custody of the child. (*Kelsey S., supra,* 1 Cal.4th at p. 849; *Adoption of Michael H., supra,* 10 Cal.4th at p. 1060.)[6]

---

[4] "A man who may be the father of a child, but whose biological paternity has not been established, or, in the alternative, has not achieved presumed father status, is an 'alleged' father." (*Zacharia D., supra,* 6 Cal.4th at p. 449, fn. 15.)

[5] Willie cites *In re Gladys L.* (2006) 141 Cal.App.4th 845 [46 Cal.Rptr.3d 434] in support of his argument the forfeiture doctrine is inapplicable because his due process rights are at stake. The Agency counters that *Gladys L.* was wrongly decided. We are not required to reach the issue, however, because we address the merits of Willie's due process claim.

[6] *Kelsey S.* pertained to a private adoption. In *Zacharia D., supra,* 6 Cal.4th at page 451, the court explained that the issue addressed in *Kelsey S.* would arise in the context of a dependency proceeding as follows: "The issue would arise . . . under facts not presented here, whether the statutory distinctions between biological and presumed fathers are unconstitutional

Willie asserts he is a *Kelsey S.* father because he "was much more than a sperm donor." He cites a notation in records from Children's Hospital and Health Center from Jason's examination on February 20, 2007, that Shanna reported Willie saw Jason "a lot," and "every day from August through December." Willie reported that "he often will meet [Shanna] and [Jason] at a park," but he had not seen Jason for a month. Further, Willie hoped Jason could be placed with Shanna's sister. Willie said "he isn't really set up to take [Jason] because he has a roommate and the aunt has kids with toys, etc." Willie was only willing to take Jason if "staying with the aunt is not possible."

 Willie points to no evidence suggesting Shanna or anyone else precluded him from establishing himself as a presumed father. Further, he points to no evidence he promptly stepped forward to assume *any* parental responsibilities, let alone full parental responsibilities. He does not, for instance, assert he ever provided *any* financial support for Jason. He admitted in his paternity questionnaire that Shanna told him he was Jason's father but he doubted that because Jason did not initially look like him. Even when his paternity was established Willie refused reunification services and did not seek custody. Rather, he wanted Jason placed with Shanna or her sister. Willie did not ask the court for custody until June 2008, approximately a year after his paternity was established. Under the circumstances he has not suffered a substantive due process violation by not being declared a father under *Kelsey S.* criteria. (*In re Elijah V., supra,* 127 Cal.App.4th at p. 584.)

 Willie's only status was that of a biological father. "[A] biological father's 'desire to establish a personal relationship with a child, without more, is not a fundamental liberty interest protected by the due process clause.' [Citation.]" (*In re Christopher M.* (2003) 113 Cal.App.4th 155, 160 [6 Cal.Rptr.3d 197], italics omitted.) " ' "Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." [Citation.]' " (*Ibid.,* quoting *Lehr v. Robertson* (1983) 463 U.S. 248, 260 [77 L.Ed.2d 614, 103 S.Ct. 2985].)

 "In the termination of parental rights area . . . the mere biological father does not fare as well as the *Kelsey* father since it appears clear that his

---

as applied to a biological father who is precluded from attaining presumed father status by the mother or a third party, but who comes forward early in the dependency process, and who displays a commitment consistent with the standard set forth in *Kelsey S.* Extending *Kelsey S.* to apply in the dependency context would allow such a father to participate as a 'parent' in, or end the need for, the dependency proceedings."

parental rights may be terminated based solely upon the child's best interest and without any requirement for a finding of detriment or unfitness . . . ." (Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2009) § 2.60[3][c], p. 2-130, citations omitted, citing *Kelsey S., supra,* 1 Cal.4th at p. 849 ["If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent."]; see *In re Sarah C., supra,* 8 Cal.App.4th at p. 981 ["[B]ecause the facts show Paul was merely a biological father who had demonstrated no willingness to accept full parental responsibilities for Sarah the court was not required to make a particularized finding Paul was 'unfit,' and was entitled to focus on Sarah's best interests in deciding to not offer reunification services and terminate Paul's parental rights so Sarah could be adopted."].) Here, likewise, the court did not err by terminating Willie's parental rights without making an express finding of unfitness.

## B

Willie cites *Santosky v. Kramer* (1982) 455 U.S. 745 [71 L.Ed.2d 599, 102 S.Ct. 1388] (*Santosky*) and *Cynthia D., supra,* 5 Cal.4th 242, for the proposition that a mere biological father's parental rights may not be terminated without a finding of his parental unfitness. He asserts that since these cases refer to the rights of a "natural parent," without any differentiation "between alleged, biological or presumed fathers," the court here was required to make a finding of unfitness before terminating his parental rights.

In *Santosky,* the United States Supreme Court disapproved of a New York law that allowed termination of parental rights for " 'permanent[] neglect[]' " when the finding was supported by a " 'fair preponderance of the evidence.' " (*Santosky, supra,* 455 U.S. at p. 747.) The court held the due process clause of the Fourteenth Amendment "requires that the State support its allegations by at least clear and convincing evidence." (*Santosky, supra,* at p. 748.) The court explained that "[b]efore a State may sever completely and irrevocably the rights of parents in their natural child, due process requires that the State support its allegations by at least clear and convincing evidence." (*Id.* at pp. 747–748.) "After the State has established parental unfitness at the initial proceeding, the court may assume at the *dispositional* state that the interests of the child and the natural parents do diverge." (*Id.* at p. 760.) "But until the State proves parental unfitness, the child and his parents share a vital interest in preventing erroneous termination of their natural relationship." (*Ibid.*)

█ In *Cynthia D.*, the mother argued section 366.26 violates due process because it allows the termination of parental rights on a finding by a preponderance of the evidence that return of the child to parental custody would create a substantial risk of detriment. Citing *Santosky*, the mother argued due process requires a showing by clear and convincing evidence. In *Cynthia D.*, the court upheld the constitutionality of section 366.26. (*Cynthia D., supra*, 5 Cal.4th at p. 256.) It explained that the statute must be considered in the context of the entire dependency process, and unlike the termination proceedings in *Santosky*, "the purpose of the section 366.26 hearing is not to accumulate further evidence of parental unfitness and danger to the child, but to begin the task of finding the child a permanent alternative family placement. By the time dependency proceedings have reached the stage of a section 366.26 hearing, there have been multiple specific findings of parental unfitness." (*Cynthia D., supra*, at p. 253, fn. omitted.)

█ Neither *Santosky* nor *Cynthia D.* pertains to the rights of mere biological fathers. In *Santosky*, the child was removed from the home of both parents (*Santosky, supra*, 455 U.S. at p. 751) and thus it appears the father would have had presumed father status under California law. In *Cynthia D.*, the child was removed from her mother's home and no father was involved. (*Cynthia D., supra*, 5 Cal.4th at p. 245.) Thus, the use of the term "natural parent" in those opinions does not suggest that California's dependency scheme may not differentiate between the two. "A decision is authority only for the point actually passed on by the court and directly involved in the case. General expressions in opinions that go beyond the facts of the case will not necessarily control the outcome in a subsequent suit involving different facts." (*Gomes v. County of Mendocino* (1995) 37 Cal.App.4th 977, 985 [44 Cal.Rptr.2d 93]; see *Chevron U.S.A., Inc. v. Workers' Comp. Appeals Bd.* (1999) 19 Cal.4th 1182, 1195 [81 Cal.Rptr.2d 521, 969 P.2d 613].)

II

*Parent-child Beneficial Relationship Exception*

Willie also challenges the sufficiency of the evidence to support the court's finding the parent-child beneficial relationship exception to adoption inapplicable.

█ "After reunification services have terminated, the focus of a dependency proceeding shifts from family preservation to promoting the best interest of the child including the child's interest in a 'placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.]' . . . At a section 366.26 hearing the juvenile court has three options: (1) to terminate parental rights and order

adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care." (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534 [41 Cal.Rptr.3d 511].)

"Adoption, where possible, is the permanent plan preferred by the Legislature." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 [32 Cal.Rptr.2d 535].) At a section 366.26 hearing, the court must terminate parental rights and free the child for adoption if it determines by clear and convincing evidence the child is adoptable, and none of the seven exceptions listed in section 366.26, subdivision (c)(1)(A) and (B) applies to make termination of parental rights detrimental to the child. (§ 366.26, subd. (c)(1).) It is the parent's burden to show the applicability of one of the exceptions to adoption. (*In re Fernando M., supra*, 138 Cal.App.4th at p. 534.)

One exception to adoption applies if termination of parental rights would be detrimental to the child because the "parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) This court has interpreted the phrase "benefit from continuing the relationship" to refer to a relationship that "promotes the well-being of the child *to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.* In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be *greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575, italics added.)

"Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*In re Autumn H., supra*, 27 Cal.App.4th at p. 575.)

In *In re Casey D.* (1999) 70 Cal.App.4th 38, 51 [82 Cal.Rptr.2d 426], we explained: "[T]he *Autumn H.* language, while setting the hurdle high, does not set an impossible standard nor mandate day-to-day contact. Rather, the decision attempts to describe the nature of the beneficial parent-child exception to the general rule that adoption should be ordered

when the child is likely to be adopted. Another way of stating the beneficial parent-child concept described in *Autumn H.* is: a relationship characteristically arising from day-to-day interaction, companionship and shared experiences. Day-to-day contact is not necessarily required, although it is typical in a parent-child relationship. A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction. The *Autumn H.* standard reflects the legislative intent that adoption should be ordered unless exceptional circumstances exist . . . ."

"A biological parent who has failed to reunify with an adoptable child may not derail adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent. [Citation.] A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be *beneficial to some degree,* but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466 [118 Cal.Rptr.2d 482], second italics added.)

In *In re S.B.* (2008) 164 Cal.App.4th 289 [79 Cal.Rptr.3d 449] (*S.B.*), this court reversed an order terminating the father's parental rights over his daughter, S.B., under the parent-child beneficial relationship exception to adoption. The parties agreed the father maintained regular, consistent and appropriate visitation with S.B., and the evidence showed he was S.B.'s primary caretaker for three years; when she was removed from his custody he immediately acknowledged his drug use was untenable, started services, maintained his sobriety, sought medical and psychoanalytic services and complied with every aspect of his case plan; after a year apart S.B. continued to display a strong attachment to her father; and she loved her father and wanted their relationship to continue. (*Id.* at p. 298.) This court concluded the "record here fully supports the conclusion Michael continued the significant parent-child relationship *despite* the lack of day-to-day contact with S.B. after she was removed from his care." (*Id.* at p. 299.) The opinion states, "S.B. loved her father, wanted their relationship to continue and derived some measure of benefit from his visits." (*Id.* at pp. 300–301.) The *S.B.* opinion must be viewed in light of its particular facts. It does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is "some measure of benefit" in continued contact between parent and child.

"The factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of

the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs." (*In re Angel B., supra*, 97 Cal.App.4th at p. 467, fn. omitted.) "[F]or the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt." (*Id.* at p. 468.)

The parties differ as to whether Willie maintained regular visitation. The Agency asserts visitation was initially sporadic, and then nonexistent when he was in Dallas. The Agency concedes his visitation was consistent once he returned from Dallas in November 2007. We are not required to resolve the issue, though, because we agree with the Agency that substantial evidence supports a finding of insufficient benefit from continuing the parent-child relationship.

Jason was only a year old when the dependency proceedings began, and he never lived with Willie. Willie had not progressed beyond supervised visitation and he consistently refused to participate in any services. Further, Willie failed to recognize that Jason needed protection from Shanna, and instead felt he should be returned to her custody.

The social worker concluded, "Jason does not share a parent-child relationship with [Willie]. . . . Jason looked to his father as a friendly visitor prior to his dependency and continues to do so. Jason enjoys seeing [Willie] and enjoys his time with [Willie]. However, Jason does depart easily from [him] after visits and Jason does not look to [Willie] to meet his daily needs." In an addendum to the assessment report, the social worker wrote, "[W]hile this worker was observing, Jason appeared to enjoy his interactions with [Willie] as he would with a friendly visitor who comes to play with him." Willie and Jason enjoyed their visits and occasionally Jason objected when they ended. Willie was affectionate and appropriate, and we do not doubt he loves his son. Jason was comfortable with Willie and called him "Daddy." A friendly relationship, however, "is simply not enough to outweigh the sense of security and belonging an adoptive home would provide." (*In re Helen W.* (2007) 150 Cal.App.4th 71, 81 [57 Cal.Rptr.3d 914].) There is no evidence Jason had any needs only Willie can satisfy, or that he has the type of emotional attachment to Willie that would cause him to be greatly harmed if parental rights were terminated.

## DISPOSITION

The judgment terminating parental rights is affirmed.

Huffman, J., and O'Rourke, J., concurred.

A petition for a rehearing was denied August 6, 2009, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 22, 2009, S175562.