Filed 8/21/15  T.T. v. Superior Court CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| T.T.,<br><br>        Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>        Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU, et al.,<br><br>        Real Parties in Interest. | A144740<br><br>(Contra Costa County Super. Ct. No. JI3-00386) |

In her petition for extraordinary writ and request for stay, T.T., a twenty-three-year-old mother of a two-and-a-half-year-old boy, C.T., seeks relief from the juvenile court's March 2015 disposition order, issued regarding the supplemental petition filed by real party in interest Contra Costa County Children & Family Services Bureau (Bureau) pursuant to Welfare and Institutions Code section 387.[1]  The court terminated services to mother and set a hearing pursuant to section 366.26 to determine a permanent plan for C.T.  Mother asserts we must grant her petition because she was not provided with reasonable services throughout the dependency proceeding.

The Bureau provided family reunification or family maintenance services to mother for about 22 months after she exposed C.T. to her physically and emotionally

---

[1]  All statutory references herein are to the Welfare and Institutions Code.

1

abusive encounter with her own father (grandfather). The encounter led to the Bureau's section 300 petition and the court's subsequent disposition order that C.T. be placed in foster care and reunification services be provided to mother. Mother at first refused to participate in services, but made enough progress by June 2014 to regain custody of C.T. and receive family maintenance services. Mother then violated her case plan by allowing grandfather unsupervised visits with C.T. and, in September 2014, engaged in another abusive encounter with grandfather in C.T.'s presence. She did not disclose this encounter to the Bureau, then lied about it and continued to allow grandfather unauthorized, unsupervised visits with C.T. until the Bureau filed its supplemental petition and the court again ordered that C.T. be placed in foster care.

We are not without sympathy for mother's view that she has been a capable mother and the long-time subject of grandfather's abuse. There are no concerns in the record about her parenting of C.T. besides her inability to protect him from her abusive encounters with grandfather. Grandfather has repeatedly abused her since her own childhood while also often being her primary means of financial support; indeed, mother regained custody of C.T. in June 2014 only after grandfather co-signed for mother's apartment. Mother was justifiably confused by the court's efforts to walk a fine line between grandfather's abuse of mother and his apparently beneficial relationship with C.T. This includes the court's perplexing order allowing grandfather supervised visits with C.T. outside of mother's presence without insisting he address his chronic abuse of mother, if only because this abuse harmed C.T. as much as mother's conduct.

Nonetheless, we must concern ourselves with C.T.'s best interests. The juvenile court and the Bureau repeatedly warned mother that she could lose services, and possibly C.T., if she allowed grandfather unsupervised access to him and engaged in more abusive encounters with grandfather in C.T.'s presence. She did not heed these warnings. Instead, she was deceptive with, and belligerent towards, the court and the Bureau and resisted fully engaging in her case plan. More to the point, we conclude mother has waived most of her appellate arguments by not timely appealing from the juvenile court's

2

prior findings that the Bureau provided reasonable services to her and otherwise find no error based on the record before us.  Therefore, we deny mother's petition.

## BACKGROUND

In May 2013, the Bureau filed a petition pursuant to section 300 indicating C.T., then four months old, had been removed from the custody of mother, then 20 years old, and detained because of mother's and C.T.'s father's[2] alleged failure to protect him pursuant to section 300, subdivision (b) for a number of reasons.

### I.

### *The Court's June 2013 Jurisdiction Order*

In its detention report, the Bureau, social worker Linda Mills reporting, summarized a police report and interviews with grandfather and mother about a May 16, 2013 incident.  Officer C. Aafedt of the Concord Police Department reported that he and another officer, Smith, responded to a 911 call from a Concord address.  911 Dispatch "could hear a female crying saying, 'you can't attack me' and then heard the male voice state, 'I will pay the price.'  Dispatch could hear the female say, 'get away from me' and the male voice said, 'I will kill you.' "  At the Concord address, mother told Aafedt "that her father had hit her all over her body."  The home and the baby's crib were a mess.  When mother indicated she slept with the baby and was told about the dangers of doing so, she "started screaming and began to hyperventilate and put the baby on the bed and yelled, 'take him I know that's what you want to do.' "  She threatened suicide, fainted at one point, and was hospitalized.

"[Grandfather] stated that they had been in an argument over a sandwich. . . .  [He] said that [mother] had threatened herself and [grandfather] suggested she get a steak knife and cut her throat if she wanted to die.  [Mother] grabbed all the pills in the kitchen and went up to the bathroom.  The pills were only vitamins.  [Grandfather] went upstairs . . . and [mother] threw the steak knife at him.  He moved and the knife hit the wall. . . .  Outside the bathroom was a hole in the wall where [mother] threw the knife."

---

[2]  The record indicates C.T.'s father did not play any role in taking care of C.T. and never appeared in the proceedings.  Therefore, we do not discuss him further.

Mills spoke with grandfather and mother. Grandfather said mother had thrown a steak knife and a wooden back scrubber at him. Mother said grandfather "was upset with her and she slammed a door causing it to break or dislodge," that grandfather "started calling her names and hitting her," "told her she should kill herself" and "said he would break her face." "[Mother] denied throwing a knife[,] . . . stated that [grandfather] hit her with a wooden scrub brush . . . [and said] she had been abused physically and verbally by [grandfather] all her life." Mills reported mother was the subject of 13 referrals from 1998 to 2010, all involving grandfather's physical abuse of her. Mills summarized three police reports about such incidents between 2008 and 2012.

Mother told Mills she stayed with grandfather because he supported her. She worked as a home health care provider for her paraplegic mother in San Francisco and hoped to get her own apartment within a month. She did not want to be apart from her son, realized she needed help and had a legal guardian in Los Angeles who might be able take C.T. Mills expressed concerns that mother was exposing her son to such an abusive relationship. Mother indicated she was the victim, and Mills advised that now her son was the victim. According to Mills, "mother did not understand the responsibility of her role in protecting her child."

Mills spoke with Dawn L., who resided in Los Angeles and said she had been mother's long-time legal guardian until mother turned 18. Dawn L. said mother's parents had a history of drug use and abandoning mother, and that she would have adopted mother except for grandfather's objections. Nonetheless, mother preferred to stay with grandfather despite their physical altercations because she could come and go as she pleased. Mother called her on May 16, 2013, and said she was in an altercation with grandfather. Dawn L. heard grandfather call mother names and tell her that " 'she needs to kill herself.' " Dawn L. called the Concord police.

The court ordered that C.T. be detained. Subsequently, the Bureau and mother stipulated that mother " 'failed to adequately supervise or protect [C.T.] by putting [him] at substantial risk for physical harm and emotional duress in that . . . [she] engaged in ongoing domestic violence with the maternal grandfather, in the presence of the child,' "

4

and that mother " 'suffers from depression, which prevents her from providing adequate care and supervision of the child.' " The court found these allegations to be true and adjudged C.T. to be a dependent of the court.

## II.

### *The Court's July 11, 2013 Disposition Order*

In its July 11, 2013 disposition report, the Bureau, social worker Alesha Jones now reporting, recommended that C.T. be placed in a foster home and reunification services be provided to mother. Jones reported that C.T. was developmentally on target and "a happy and healthy baby" who had adjusted well to his foster home.

Jones reported that mother continually expressed concerns about C.T.'s well-being and said she loved him and would do anything to get him back, but believed the Bureau's involvement was unwarranted. Jones referred her to domestic violence, counseling and parenting services, but mother had not begun any. Jones was in the process of arranging a mental health assessment for mother through Contra Costa County Mental Health services. The Bureau's recommended case plan included that mother "complete a Mental Health Assessment . . . approved by the social worker . . . and follow all recommendations resulting from that assessment," participate in a domestic violence program and participate in parenting education.

Mother and her counsel were present at the July 11, 2013 disposition hearing. They had no objections to or comments about the Bureau's recommendations. The court found the recommendations to be appropriate and adopted them. It told mother that if she did not start participating in services, the court would move forward in C.T.'s best interests, including finding permanency for him.

## III.

### *The Court's September 12, 2013 Order Giving Grandfather Visitation Rights*

The court had ordered no contact between C.T. and grandfather based on the Bureau's allegations. In July 2013, grandfather sought visitations. The Bureau recommended that he be allowed supervised visitations "due to the fact that prior to Court intervention with this family he had been a care provider both financially and physically

5

for this child." At the subsequent hearing on September 12, 2013, mother's counsel was present and indicated that mother had no objections to these visitations. The court adopted the Bureau's recommendation.

## IV.

### *The Court's December 18, 2013 Six-Month Status Review Order*

In its December 18, 2013 status review report, the Bureau, Jones again reporting, indicated that C.T. remained stable at his current placement, was being treated for asthma and was developmentally on target.

Jones reported that mother in her twice-monthly visits with C.T. was "very appropriate, comes prepared to interact with her child and provides the foster mother with supplies for the child. She appears loving and nurturing." Mother had completed a parenting and domestic violence program as required by her case plan. Her discharge summary from her May 16, 2013 hospitalization, which occurred the day she had the abusive encounter with grandfather, indicated she was admitted for suicidal ideation and was diagnosed with a "mood disorder," had a negative toxicity screen, was not prescribed any medication and received a recommendation that she follow up with a Kaiser Hospital therapist.

The Bureau referred mother to a Kaiser therapist. Mother reported that she had an intake appointment with one in November 2013 at Kaiser Antioch. "Mother reports that [the therapist] believes that mother has anxiety and that the recommended treatment plan is for her to attend support groups with periodic individual therapeutic check in sessions. She continues to report that she has been attending weekly anxiety support groups . . . and an anxiety life skills group . . . ." Jones needed to confirm that mother was following all recommendations and could safely care for C.T. Mother said she had learned from her mistakes and was willing to do whatever the Bureau asked of her to successfully reunify with C.T. Grandfather had begun monthly visits with C.T. C.T. was "very responsive" to him, and grandfather was "very engaging and nurturing."

The Bureau recommended as a part of mother's case plan that she engage in a domestic violence program and "general counseling," meaning that she "enter and

6

successfully complete individual counseling, approved by the social worker, and receive a positive evaluation from therapist that [mother] understands the factors contributing to this dependency [and] has successfully addressed those issues . . . ."

At the six-month status review hearing on December 18, 2013, the court approved the Bureau's updated case plan and gave it discretion to allow mother overnight visits with C.T. The court told mother it was "important" that C.T. develop his "very positive" relationship with grandfather, even though mother's relationship with grandfather was "strained." It also scheduled an interim review hearing. The court found reasonable services had been provided or offered to mother that were designed to overcome the problems that led to C.T.'s initial removal and continued custody.

## V.

### *The Court's March 13, 2014 Interim Review Order*

For the March 13, 2014 interim review hearing, the Bureau, social worker Trudi Frazel now reporting, submitted an interim memo. Mother was regularly attending twice-weekly visits with C.T. and was "consistently nurturing and affectionate towards [C.T.]." There were no concerns about her parenting. She was attempting to find stable housing with the Bureau's assistance.

Frazel met with mother in late February 2014 and discussed mother's participation in mental health services. Mother said her therapist had recommended "a drop-in group to address anxiety" and that "she has been 'really busy.' [Mother] said, 'I feel like I'm being forced' by the Bureau to go to therapy. [Mother] said [the therapist] said her anxiety was circumstantial and was related to [C.T.] not being with her. [Mother] said that going to therapy and groups does not help her, and she feels 'the same way' after sessions as she does when walking in, and she does not want to keep reliving over and over again the [Bureau] removal of her son. [Mother] said she just wants to move forward with her life and get her son back."

Mother's therapist told Frazel mother had missed one out of three sessions and been significantly late for another because of transportation issues. Mother had not expressed any suicidal ideation, nor shown any signs of volatility or impulsivity. While

she was "very pleasant and polite" during sessions, she did "not see the need for therapy, but will do whatever is necessary to reunify with her son." The therapist thought mother was "simply 'marking time' in order to comply with her case plan."

Frazel reported she and mother disagreed about the mental health component of mother's case plan. Frazel "had been referring to the initial case plan, and not the updated case plan, when reviewing [mother's] client responsibilities." Frazel requested that the court address this issue during the interim review hearing "to identify whether [mother's] participation in general counseling services to date is adequate to address the issues which brought the child to the attention of the Bureau and the Court." Frazel also recommended the court give the Bureau discretion to allow unsupervised and overnight visits between mother and C.T. and order that C.T.'s unsupervised visits with the mother not occur in the presence, nor in the home, of grandfather.

Near the beginning of the March 13, 2014 interim review hearing,[3] the court said it met with Frazel and counsel about Frazel's interim memo before calling the case. "Based on this memo," the court continued, "the Court really believes that if we are able to get Mom into some stable housing that it would be appropriate to allow Mom to have overnight visits and really push this forward in terms of reunification."

Later, after mother indicated her mailing address continued to be at her father's home and minor's counsel said he saw grandfather outside the courtroom, mother said, "he is the grandfather, so he's going to continue in my life. I'm not just going to shoot someone out of my life." She said grandfather had brought her to the hearing. The court responded that it "has already allowed the grandfather to have some visits with [C.T.] because it's really important. However, you and your father have been embroiled in a very dysfunctional relationship involving violence. And it's because of the nature of that relationship . . . that put you and your son before this Court and nothing else. [¶] So you're going to need to find an alternative location to live if you're going to be successful

---

[3] Before the interim review hearing began, the court considered and denied a motion by mother to replace her counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118. Mother does not take issue with that ruling in her petition.

8

in reunification, because that is going to be an unsafe place." Mother said she was aware of that and that she was shocked the court was even thinking about placing C.T. with grandfather. The court said it had never considered doing so. It said it would not place C.T. with her if she lived with the grandfather and that it had "concerns placing the child with you if you and grandfather are together with the child . . . because it's the relationship between you and your dad that places the child at risk." Mother asked why then grandfather was allowed visitations and the court responded, "Because the two of you aren't together." The court said if C.T. were returned to her custody, "[i]f there's going to be visits with the grandparent then it wouldn't be with you present" and that "when [C.T.] is in your care you are not to have your father or mother present, period."

## VI.

### *The Court's June 19, 2014 Twelve-Month Status Review Order*

In its June 12, 2014 status review report, the Bureau, Frazel again reporting, indicated that C.T. was a "healthy, sturdy, strong one-year-old boy" who was being treated for asthma and developmentally on target. He was a "sweet boy" who enjoyed hugs with mother, foster mother and grandfather, and displayed no signs of emotional distress. He continued to do well in foster care.

Frazel reported that mother had made "significant progress" on her case plan objectives and services. She had obtained a satisfactory two-bedroom apartment in Concord co-signed for by grandfather. She had begun unsupervised visits with C.T., which had gone well. Mother was "resourceful and highly motivated to reunify" with C.T., was employed and had the ability to meet C.T.'s needs. Although mother and Frazel's relationship had begun under "difficult circumstances, [mother had] demonstrated that she has the capacity to work cooperatively and collaboratively with others, despite challenges presented to her."

Mother's therapy had ended because of the limits of her Kaiser coverage. The therapist reported that mother "appeared to be 'glossing over' some of the circumstances that led to [C.T.'s] removal. [The therapist] informed [Frazel] that [mother] did not present with any suicidal ideation, volatility, or emotional instability during their work

9

together, nor did [mother] report any symptoms of mental or emotional distress which would have necessitated intensive therapeutic intervention."

The Bureau recommended that C.T. be returned to mother's care and family maintenance services be ordered. It also recommended that mother's case plan include that she and grandfather participate in therapeutic or other services to gain conflict resolution skills. Both told the Bureau they were willing to do so.

At the twelve-month review hearing on June 19, 2014, all parties submitted regarding the Bureau's report without objection. The court adopted the Bureau's recommendations. The court found reasonable services had been provided or offered to mother that were designed to overcome the problems which led to C.T.'s initial removal and continued custody.

## VII.

### The Court's October 7, 2014 Detention of C.T.

On September 15, 2014, the Bureau filed a supplemental petition pursuant to section 387 alleging that mother had failed to adequately supervise and protect C.T. The Bureau alleged that on September 13, 2014, mother had left C.T. in grandfather's care, Concord police had been dispatched to grandfather's home due to a domestic dispute, mother had swung a glass dish at grandfather, grandfather had repeatedly struck mother and mother had thrown a rock into a window of grandfather's apartment. C.T. again was in foster care.

In an October 7, 2014 memorandum to the court, the Bureau, social worker Melissa Leiva now reporting, indicated that Leiva met with mother in her home on September 24, 2014. Mother said C.T. was not present for her altercation with grandfather, but was outside with mother's boyfriend. Mother said she went to grandfather's home to retrieve some belongings and diapers after grandfather sent her a text asking her to do so, grandfather attacked her upon her arrival and she tried to run towards her boyfriend for help. C.T. did not see any of this.

10

Leiva spoke to mother's boyfriend, H.D., and to grandfather. H.D. said he was outside with C.T., who did not see any of the altercation. Grandfather said he did not want to talk and referred Leiva to the police report.

Leiva summarized a police report about the encounter that indicated mother, H.D. and grandfather "all stated that [mother] had gone to [grandfather's] home to pick up [C.T.] [Mother and grandfather] report[ed] getting into a verbal argument that led to a physical altercation over who left the rear door open the previous night. [Mother] reported to the police that [grandfather] asked her to leave, but she proceeded inside to change her son's diaper and continued to argue with [grandfather]. C.T. was present during the subsequent physical altercation. [H.D.] reported to the police that he was outside alone and saw mother run out crying and yelling for help, followed by [C.T.] who then ran towards [H.D.] and was taken to the vehicle. . . . [T]he police could not determine who the primary aggressor was."

Mother did not notify the Bureau about the encounter. She had been told that grandfather could not have unsupervised visits with C.T. until mother and grandfather had participated in conflict resolution services. Mother had at first resisted participating in family therapy, but at the time of the encounter mother and the Bureau were navigating insurance issues in order to find a family therapist. The Bureau recommended C.T. be detained in out of home placement.

At the October 7, 2014 detention hearing, minor's counsel supported the Bureau's detention recommendation. The court heard testimony, including from the Bureau's social worker, Leiva, and mother's boyfriend, H.D. Among other things, Leiva testified that she spoke to grandfather by telephone the afternoon before the hearing. Grandfather said he was taking care of C.T. "basically every single day." Leiva could hear C.T. in the background. Grandfather confirmed C.T. was with him. H.D. testified consistent with his statements to Leiva before the hearing that on the day of the September 13, 2014 incident, C.T. was outside the apartment with him and did not witness the altercation between mother and grandfather. Also, he did not think mother left C.T. with grandfather for childcare.

11

At the conclusion of the hearing, the court found H.D.'s testimony was incredible and adopted the Bureau's recommendations. It found no reason to not believe the police report's recounting of what mother, H.D. and father said at the time of the encounter. It was "very disturbed to hear that mother has been engaging in conduct that originated these proceedings" and that "we're right back where we began."

After the court announced C.T.'s detention, mother tried to make a statement. The court admonished her, and she further disrupted the proceeding. The court noted for the record that "mother had to be escorted out of the courtroom by the deputy when she would not be quiet, and she became incredibly aggressive and combative in the hallway with security personnel who tried to get her to calm down." Mother was "very aggressive in the courtroom and irrational," which indicated a safety issue for C.T. and his foster family.

## VIII.

### *The Court's November 19, 2014 Supplemental Jurisdiction Order*

At the beginning of the supplemental jurisdiction hearing on October 15, 2014, the Bureau's counsel said mother had been "blowing up the phone" to the foster mother and that there had been "quite a bit of back-and-forth hostility towards the social worker." When the court attempted to address mother regarding her behavior, she turned belligerent. She stated, "I don't have to listen to you anymore. If you guys aren't going to listen to me then why should I listen to you?" The court instructed that she be taken out of the courtroom. It limited her phone calls to the foster home to one per week and continued the hearing.

At the continuation of the supplemental jurisdiction hearing on November 19, 2014, mother remained outside the courtroom. She objected to jurisdiction but presented no evidence. The court sustained the section 387 petition allegations.

## IX.

### *The Court's March 24, 2014 Supplemental Disposition Order*

Mother retained new counsel and contested supplemental disposition. Her counsel argued in a brief that, among other things, mother did not receive reasonable services

because the Bureau failed to provide the mental health assessment of mother that was a part of her July 2013 original case plan and did not provide reasonable services to prevent C.T.'s removal in September 2014.

In its February 18, 2015 supplemental disposition report, the Bureau, social worker Karl Arana now writing, reported that C.T. did not show any signs of abuse or neglect. Mother needed "to break her own cycle of violence so that her son does not have to follow her path." "Possible interventions would be to obtain a thorough mental health assessment so that she could be directed to the most appropriate support and therapeutic services." Mother was pregnant, not working, and engaged to H.D., the father of her unborn child, who worked as a contractor. She was remorseful that she "forgave" grandfather, had wanted to visit him with C.T. and thought the violence would have stopped. Mother was communicating with Arana and said she was again in therapy. The Bureau recommended that the court deny mother reunification services and set a section 366.26 hearing.

At the contested supplemental disposition hearing in March 2015, mother's counsel requested that the court allow her to present evidence regarding whether the Bureau had provided reasonable services to mother since the beginning of the case. The Bureau's counsel objected on the ground that the court's previous orders and findings on the matter were final and no longer subject to contest. The only matters at issue were Arana's recommendations, although counsel did not object to inquiries about the Bureau's reasonable efforts between the time family maintenance services were ordered for mother and the sustaining of the supplemental petition. Minor's counsel agreed with this position. The court also agreed, and limited the introduction of evidence accordingly. However, it took judicial notice of its orders in the case at mother's counsel's request. It also allowed mother's counsel to argue that the Bureau had not provided reasonable services since the beginning of the case. Social workers Leiva and Arana testified regarding different aspects of the services provided to mother by the Bureau, which we will address further in the discussion section.

13

The court adopted the Bureau's recommended findings and actions. These included that reasonable efforts were made to prevent or eliminate the need to remove C.T. from mother's home, that there was clear and convincing evidence that there was a substantial danger to C.T. if he were returned to mother's home and no reasonable means to protect him without removing him from mother's physical custody, that more than 18 months had passed since the date of initial removal, that mother would not be provided any reunification services and her family maintenance services were terminated, and that the Bureau had complied with the case plan in making reasonable efforts to return C.T. to a safe home. It stated at the hearing, "This is very serious domestic violence that was chronic in mother's life even when she was a child. And then mother was extremely slow to go, but she did finally get on board. She engaged in services. She was successful in reunifying in a plan of family maintenance, and mother went right back to square one with what she engaged in with [grandfather] again, which led to the filing of the supplemental petition. [¶] It was a very serious and egregious violent confrontation in the presence of the child placing this child at a very substantial and significant risk of harm." The court cited mother's outbursts in the courtroom and her "complete meltdown and disturbance in the court hallway" as indications of her potential "out-of-control" behavior with C.T. in the community. Noting that mother was only really entitled to six months of services, the court asked, "Why should the Court deny this little child . . . the opportunity of permanency in a safe, loving, stable environment[?]" The court concluded, "I've heard nothing that convinces me that even if 18 months had not expired, the Court should agree to . . . give mother even more time, given the complete lack of progress and insight in this case." The court scheduled a section 366.26 hearing for July 20, 2015.

Mother timely filed this petition and request for a stay of the section 366.26 hearing. We have stayed that hearing pending the outcome of this petition.

## DISCUSSION

Mother's arguments can be divided into three categories of reasons why we should grant her petition: First, she was not provided with reasonable services in compliance

14

with her original case plan throughout the proceeding, dating back to the court's July 11, 2013 disposition order and, moreover, the juvenile court violated her due process rights by prohibiting her from so arguing at the March 2015 supplemental disposition hearing. We conclude she has waived these arguments.

Second, she was not provided with reasonable family maintenance services as required by the court-ordered case plan implemented in June 2014 because the Bureau did not provide her with a referral for family therapy services until December 3, 2014. We conclude the court did not abuse its discretion in determining that she was offered or provided reasonable services in compliance with this case plan and that its ruling is supported by substantial evidence.

Third, the Bureau did not make reasonable efforts or provide reasonable services to prevent removal of C.T. from her custody the second time, in October 2014, or thereafter. Again we conclude that the Bureau did not abuse its discretion in determining otherwise, and that its ruling is supported by substantial evidence.

## I.

### *Relevant Law*

Both the Bureau and mother assert that, when a juvenile court sustains a supplemental petition pursuant to section 387, "the question becomes whether reunification services should resume"; and also that a court may resume reunification services if, among other things, a parent has not received reasonable services. (*Carolyn R. v. Superior Court* (1995) 41 Cal.App.4th 159, 166; but see *San Joaquin Human Services Agency v. Superior Court* (2014) 227 Cal.App.4th 215, 224-225 [regardless of the juvenile court's finding that services were not reasonable due to a delay, it could not extend reunification services beyond 18 months because of the absence of statutorily required factors or external factors that prevented mother's participation in her case plan].) Rules of Court, rule 5.565(f) provides that "[i]f a dependent child was returned to the custody of a parent or guardian at the 12-month review . . . and a 387 petition is sustained and the child removed once again, the court must set a hearing under section 366.26 unless the court finds there is a substantial probability of return within the next 6

15

months or, if more than 12 months had expired at the time of the prior return, within whatever time remains before the expiration of the maximum 18-month period." (*See In re G.W.* (2009) 173 Cal.App.4th 1428, 1438 [indicating rule 5.565(f) applies to a court's supplemental disposition rulings on a section 387 petition].)

The parties disagree about our standard of review of the juvenile court's rulings. Mother cites case law indicating that we review for substantial evidence a juvenile court's determination that the return of a child to a parent would be detrimental. (See, e.g., *Robert L. v. Superior Court* (1996) 45 Cal.App.4th 619, 625.) The Bureau, although it refers to the substantial evidence standard, argues that we should review the juvenile court's determination not to resume reunification services for abuse of discretion. (*Carolyn R .v. Superior Court*, *supra*, 41 Cal.App.4th at pp. 166-167.)

Neither party is completely wrong. Generally, "[w]e review the juvenile court's findings for substantial evidence, and the juvenile court's decisionmaking process based on those findings for abuse of discretion." (*San Joaquin Human Services Agency v. Superior Court* (2014) 227 Cal.App.4th 215, 223.) " 'Substantial evidence' means evidence that is reasonable, credible and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case." (*In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401.) We resolve all conflicts in favor of the prevailing party and recognize that issues of fact and credibility are questions for the trier of fact; we do not reweigh the evidence. (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) Under each standard, we find mother's remaining two "lack of reasonable services" arguments unpersuasive.

16

## II.

### *Mother Has Waived Her "Lack of "Reasonable Services" Argument for the Period Before June 2014 by Not Timely Appealing from the Juvenile Court's Six-Month and Twelve-Month-Status Review Orders.*

Mother first argues that the juvenile court's March 2014 supplemental disposition order was improper because the Bureau did not provide her with reasonable services, i.e., a mental health assessment called for in the original case plan approved by the juvenile court in July 2013, which assessment disappeared from the updated case plan approved by the court in December 2013 and was left unaddressed despite Frazel's request for clarification about it in March 2014. She also argues that the juvenile court denied her due process by not allowing her to pursue this lack of reasonable services argument at the supplemental disposition hearing. The Bureau argues that mother has waived these arguments by not timely appealing from the juvenile court's findings at the six-month and twelve-month status review hearings that the Bureau provided reasonable services to mother. We agree with the Bureau.

Section 395, subdivision (a)(1) provides in relevant part that "[a] judgment in a proceeding under Section 300 may be appealed in the same manner as any final judgment, and any subsequent order may be appealed as an order after judgment." "The dispositional order is the 'judgment' referred to in section 395, and all subsequent orders are appealable. [Citation.] ' "A consequence of section 395 is that an unappealed disposition or postdisposition order is final and binding and may not be attacked on an appeal from a later appealable order." ' " (*In re S.B.* (2009) 46 Cal.4th 529, 532.) Thus, " '[a] challenge to the most recent order entered in a dependency matter may not challenge prior orders for which the statutory time for filing an appeal has passed.' [Citation.] The rule serves vital policy considerations of promoting finality and reasonable expedition, in a carefully balanced legislative scheme, and preventing late-stage 'sabotage of the process' through a parent's attacks on earlier orders." (*In re Jesse W.* (2001) 93 Cal.App.4th 349, 355.) "First and foremost, . . . disregarding the rule

17

would subvert the predominant interests of the child and the state in finality and reasonable expedition." (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1156.)

The juvenile court found in its December 2013 and June 2014 status review orders that the Bureau had provided reasonable services to mother after her case plan no longer included that the Bureau provide her with a mental health assessment. Her time to appeal these orders ended long before the supplemental disposition hearing in March 2015. (See Cal. Rules of Court, rule 8.406(a)(1) [subject to exceptions not applicable here, "a notice of appeal must be filed within 60 days after the rendition of the judgment or the making of the order being appealed"].)

In her brief in support of her petition, mother does not address the juvenile court's ruling that her argument was untimely. We gave her the opportunity to respond to the opposition filed by the Bureau, including its extensive discussion of the waiver rule. In her reply brief, she tardily argues we should not apply the waiver rule based primarily on case law that neither addressed the waiver rule nor involved a court's supplemental disposition order regarding a section 387 petition, such as *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1210-1211 and *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242. She gives us no reason to disagree with the juvenile court's conclusion that much of her "lack of reasonable services" argument was untimely. Specifically, we conclude, as did the juvenile court, that she has waived her argument that she was not provided with reasonable services prior to C.T. being returned to her custody in June 2014, due to her failure to timely appeal from the juvenile court's December 18, 2013 six-month status review and June 19, 2014 twelve-month status review orders, in which the court determined that reasonable services were offered or provided to mother.

Also, without deciding the issue, we are doubtful that mother was not provided with a mental health assessment that satisfied the requirement in her original case plan. According to the Bureau's December 2013 six-month status review report, it referred mother to a Kaiser therapist. Mother reported that she had an "intake appointment" with a Kaiser therapist in November 2013, who believed mother suffered from anxiety and recommended a treatment plan for her. Although the Bureau did not refer to a mental

18

health assessment, the record suggests that the Bureau considered the therapist's review of mother's condition as such (and also referred to the discharge summary from her hospitalization, which stated she had a "mood disorder"), and thereafter focused on mother's counseling needs consistent with the therapist's recommended treatment plan.

Mother makes much of Frazel's reference to the original case plan in her March 2014 interim memo to the court and her request that the court clarify the mental health services in which mother was required to participate. According to mother, neither the court nor the Bureau addressed this at the interim review hearing. However, mother ignores that the court stated at the hearing that it discussed the interim memo with Frazel and counsel off the record. It is reasonable to presume that the court addressed Frazel's concern at that time.

### III.

***Mother Was Provided with Reasonable Family Maintenance Services Pursuant to the Case Plan Adopted in June 2014.***

On June 19, 2014, the court ordered C.T. returned to mother's custody and family maintenance services be provided to mother as recommended by the Bureau, which included that she and grandfather participate in therapeutic or other services to gain conflict resolution skills. Mother contends that the Bureau, because it did not provide these family therapy services to mother, failed to provide her reasonable family maintenance services during that time and that this is a basis for granting her petition.

Mother's argument challenges the juvenile court's finding to the contrary, evidenced by the court's adoption in its March 24, 2015 supplemental disposition order of the Bureau's recommended finding that it had complied with the case plan in making reasonable efforts to return C.T. to a safe home. Because she timely appealed from the March 24, 2015 order, mother's argument that she was not provided with reasonable family maintenance services after the court ordered them in June 2014 is not waived, but nonetheless, it lacks merit. Mother's argument asks that we reweigh the evidence and ignores the substantial evidence presented to the court that indicated mother resisted the

19

Bureau's reasonable efforts to provide her with family therapy services prior to C.T.'s removal from mother's home.

As the Bureau points out, Leiva testified at the supplemental disposition hearing that on July 17, 2014, she reviewed mother's case plan with her, including the requirement that mother and grandfather engage in family therapy. Mother indicated she was willing to engage in such therapy. On July 21, 2014, Leiva called mother and gave her information about Shelter, Inc, but she could not give mother a referral for family therapy because there was a problem with her insurance, which Leiva discussed with mother in a July 2014 phone conversation. Mother's Kaiser insurance had ended. She was supposed to have applied for Medi-Cal, but had not yet obtained that coverage. Leiva told mother she needed to apply and understood mother had been told where to do so by the previous social worker. Leiva had no other means by which to give mother a family therapy referral. The Bureau would not refer her and pay for family therapy without Medi-Cal because mother could obtain coverage from that program. Mother said she did not want to participate in family therapy and asked why it was necessary. Leiva referred her to the particular item calling for it in her case plan.

Subsequently, the Bureau social worker then handling the case, Arana, testified that he understood that mother's Medi-Cal problem was related to her changing her county of residence, which required her to go in person in her new county of residence to reapply for Medi-Cal, and that she was instructed to do so. There was no evidence introduced at the hearing to contradict this understanding.

Leiva then spoke to mother on August 12, 2014, about therapeutic services for her and grandfather. Leiva told mother that if she felt grandfather would not attend such services mother should make an appointment and still go to show she participated in the services. Mother was agreeable to doing that. Leiva still could not provide a referral, however, because the Medi-Cal issue was not resolved. She did not make a referral to mother to free or low-fee therapeutic services from a Bureau list because these were usually reserved for families that did not have any coverage.

20

Leiva's testimony provides substantial evidence that the Bureau attempted to work with mother to provide her with a referral for family therapy services, but was prevented from doing so because mother did not obtain Medi-Cal coverage, for which she was eligible, despite the Bureau's timely notice to her of her need to do so. At times, mother also indicated her resistance to participating in family therapy, suggesting a reason for her continued failure to obtain Medi-Cal. Further, mother does not establish that the Bureau's policy of not referring Medi-Cal eligible individuals to free or low-cost services was unreasonable. The juvenile court could reasonably conclude from this evidence that mother was offered reasonable services. The juvenile court's finding that mother was offered reasonable services was supported by substantial evidence and, therefore, it did not abuse its discretion in ordering that mother's services be terminated and a section 366.26 hearing be scheduled.

## IV.

### *Mother's "Lack of Reasonable Efforts and Services To Prevent Removal" Argument*

Finally, mother argues that the Bureau did not make any reasonable efforts or provide reasonable services to prevent C.T.'s removal from her custody in October 2014 pursuant to the section 387 petition or at any time thereafter until the court terminated services in its March 24, 2015 supplemental disposition order. This argument challenges the court's adoption in its March 24, 2015 supplemental disposition order of the Bureau's recommended findings that reasonable efforts were made to prevent or eliminate the need to remove C.T. from mother's home, that there were no reasonable means to protect him without removing him from mother's physical custody and that the Bureau had complied with the case plan in making reasonable efforts to return C.T. to a safe home. This argument is timely too, but again, mother's argument asks that we reweigh the evidence and ignores the substantial evidence to the contrary.

At the supplemental disposition hearing, the Bureau had the burden of establishing that reasonable efforts were made to prevent or eliminate the need for removal of C.T. from mother. (E.g., *In re Javier G.* (2006) 137 Cal.App.4th 453, 463.) Mother argues that the Bureau did nothing in this regard, nor did it provide reasonable services. Again,

21

she ignores substantial evidence from which the court could reasonably conclude that reasonable efforts were made and reasonable services offered or provided. Specifically, the Bureau did not immediately detain C.T. after learning of the September 13, 2014 abusive encounter between mother and grandfather. Instead, it conducted an investigation that included Leiva's interview of mother on September 24, 2014. Leiva also interviewed H.D., contacted grandfather and obtained the police report about the encounter. It is clear from this investigation that mother concealed the encounter from the Bureau, lied to Leiva about allowing grandfather unauthorized, unsupervised visits with C.T., and lied to Leiva about C.T.'s presence at the encounter.

By the time she met with mother on September 24, 2014, Leiva testified, she had a referral for family therapy for mother. She had tried calling mother on September 11 to give her the referral, but had not heard back from her. She did not give the referral to mother at their September 24 meeting "because [mother] said she didn't want to go [to] family therapy."

Leiva further testified that she later spoke to mother, who said she wanted the family therapy referral, so Leiva mailed it to her. Leiva acknowledged that she did not mail it until December 3, 2014. Leiva also testified that she included in this mailing a referral for a restraining order clinic and informed the Bureau's domestic violence liaison of the situation. She had given mother the domestic violence referral by telephone earlier.

The record also indicates mother engaged in outbursts before the court on October 7, 2014, and October 15, 2014, which included her declaration on October 15 that she would no longer listen to the court or the Bureau.

As we have discussed, Leiva mailed a family therapy referral to mother on December 3, 2014. Arana testified that when he took over the case in December 2014, he told mother the Bureau was recommending no services be provided, but encouraged mother to continue to work on her case plan. Mother told him she had begun therapy and was participating in a domestic violence educational program called "STAND." Arana

22

gave mother a "Surviving Parenthood" handbook, which listed county-wide supportive services.

After meeting with mother, Arana wrote the Bureau's supplemental disposition report. Although the Bureau recommended that services be terminated, Arana pointed out that a possible intervention would be a mental health assessment because, as he later testified, he thought mother could benefit from the assessment, which he believed was required in all domestic violence cases.

Based on this evidence, the juvenile court could reasonably conclude that the Bureau made reasonable efforts and offered reasonable services before October 7, 2014, and after, to prevent C.T.'s removal from mother. As the Bureau points out, "[i]n almost all cases, it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) The juvenile court's conclusion here was supported by substantial evidence and was not an abuse of discretion, particularly in light of mother's violation of her case plan requirement that she not allow grandfather unsupervised visitations with C.T., her exposure of C.T. to her September 13, 2014 domestic violence encounter with grandfather, her concealment of this encounter and lies about it to the Bureau, her resistance to her case plan and her other problematic conduct.

## DISPOSITION

The petition is denied. The stay we have previously issued is dissolved. Our decision is final as to this court immediately. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

23

_____
STEWART, J.

We concur.

_____
KLINE, P.J.

_____
RICHMAN, J.